# CHARLESTON.

J. E. BERRY v. HUNTINGTON MASONIC TEMPLE ASSOCIATION.

Submitted April 17, 1917.   Decided May 1, 1917.

1.   CONTRACTS — *Architect's Certificate — Agency for Owner — Arbitration.*

In so far as an architect exercises rights and powers, under a building contract, reserved absolutely and unconditionally to the owner, by the contract, he is the agent of the owner; and, although he may be made the arbiter between the owner and contractor as to some matters that may arise under the contract, his agency is separable and, in it, he binds his principal by his acts as fully and completely as if he did not possess the powers of arbiter. In those instances in which he acts as arbiter, he acts for, and binds, both, if his decisions are not, for any reason, impeachable. (p. 359).

2.   SAME—*Architect's Certificate—Avoidance—Grounds.*

To avoid, set aside or overthrow an architect's certificate made conclusive by the terms of a building or construction contract providing therefor, it is not necessary to prove actual fraud or bad faith in the making thereof, or circumstances from which fraud or *mala fides* therein can be inferred. It suffices to prove conduct and circumstances from which a jury may infer that it was made capriciously, arbitrarily or without any reason. (p. 359).

3.   SAME—*Construction—Providing Shop Drawings.*

Under a building contract devolving upon the contractor the duty of providing "shop drawings," but making their adoption and use in the building depend upon the approval of the architect, the contractor is entitled to a fair and reasonable opportunity to present

such drawings and have them considered and passed upon, and it is the duty of the architect, as agent of the owner, to accord such opportunity and allow reasonable time for modification or revision of unsatisfactory drawings and for presentation of new or different drawings.  (p. 366).

4.  SAME — *Building    Contracts — Architect's    Approval — Owner's Liability.*

If, under such a contract, the architect, after having objected to shop drawings submitted and refused to approve them, declines to consider modifications or revisions, and new drafts, thereof, made in an honest effort to meet the requirements of specifications and drawings furnished by him, and thus hinders and delays the progress of the work for such time and in such manner as to inflict financial embarrassment upon the contractor, rendering it impossible for him to proceed with and complete the work, the owner is liable as for a breach of his contract, and the architect's certification of the contractor's failure to prosecute the work and his own opinion that such failure is sufficient cause for terminating the employment, affords the owner no protection.  (p. 366).

5.  DAMAGES—*Measure of Damages—Breach of Building Contract.*

A contractor under a building contract who, after having performed a portion of the contemplated work, is prevented from completing the same by the owner, or is justified in his abandonment thereof, by a breach of the contract by the owner, may recover not only the value of the labor and materials bestowed upon the property and expenses necessarily incident to the work done and provided for in the contract, but also such profits as he could have made, if permitted to complete the work.  (p. 366).

6.  TRIAL—*Instructions—Refusal.*

An instruction specifying a number of the items of a bill of particulars and having for its purpose direction to disallow all of them, is properly refused, if any one of those named is recoverable.  (p. 366).

7.  DAMAGES—*Measure of Damages—Breach of Contract—Expenses.*

A liability upon a contractor in a building contract to engineers for the cost of drawings the contract made it his duty to provide, is a proper item of recovery in an action by the contractor against the owner, for damages for wrongful prevention of performance of the contract, if a breach thereof warranting recovery is established, even though some of the drawings for which such liability was incurred, were disapproved and rejected by the architect.  (p. 366).

(LYNCH, PRESIDENT, absent).

(RITZ and WILLIAMS, JUDGES, dissenting in part).

Error to Circuit Court, Cabell County.

Assumpsit by J. E. Berry, doing business, etc., against the Huntington Masonic Temple Association. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*W. K. Cowden* and *Holt, Duncan & Holt,* for plaintiff in error.

*Geo. S. Wallace, W. W. Smith,* and *D. B. Daugherty,* for defendant in error.

POFFENBARGER, JUDGE:

This writ of error challenges a $25,000.00 judgment rendered in an action in assumpsit and founded upon the theory of a breach of a building contract, by the owner. It represents the jury's estimate of the value of work done and materials furnished by the contractor and gain or profit lost or prevented by the alleged wrongful conduct of the owner.

Sufficiency of the pleadings to develop and define the dominant issue in the case, the character of the breach of the contract for the erection of a seven story reinforced concrete building, known as the Huntington Masonic Temple, seems to be conceded. The overruling of a demurrer to the second amended declaration is assigned as error, but no argument is submitted in suport of the assignment.

The defense on the issue of liability is predicated on the theory of a breach of the contract by the plaintiff himself, justifying the action of the defendant in reletting the contract to another, for completion at his expense. The architect employed for supervision of the work certified, April 10, 1912, that the plaintiff was not prosecuting the work with diligence, had failed to supply sufficient skilled workmen or proper materials at any time since he took charge of the work, did not possess the necessary equipment, experience or knowledge to enable him to complete the building as per contract, and had not provided any employees or assistants who possessed such equipment or knowledge. On receipt of that letter, the owners communicated the purport thereof to the Citizens Trust & Guaranty Company, of Parkersburg, W.

Va., the surety in the plaintiff's $35,000.00 bond given to guarantee performance of the contract. Correspondence between them and the surety company ensued and, on May 30, 1912, the manager of that company went to Huntington and made an investigation of the situation. On June 14, following, he returned to Huntington, and, on the next day, June 15, 1913, a contract was entered into by The Huntington Masonic Temple Association, The Citizens Trust & Guaranty Co., and the Moore Construction Co., by which the work was relet to said Moore Construction Co. at the original contract price, $121,500.00.

The ground of dismissal of the plaintiff, relied upon in the evidence as well as in one of the special pleas filed, for justification thereof, was not specifically set forth in the architect's certificate, namely, financial inability of the plaintiff to carry on and complete the work. The notice followed the language of the contract providing therefor. The special plea is based upon a provision of the surety contract between the plaintiff and the Citizens Trust & Guaranty Co., authorizing the latter to take over and sub-let or complete the work, if, at any time, it should appear that the principal had abandoned the work or would not be able, or should not intend, to perform the contract..

The surety company did not avail itself of this provision of the contract, until about two months after the date of the architect's certificate. The owners gave it formal notice of the contractor's inability to complete the contract, on June 5, 1912, and, as stated, the contract was relet on June 15, 1912. It is shown that, on May 30, 1912, the contractor was laboring under financial embarrassment; some judgments having been recovered against him and one or more executions issued thereon. He seems to have held on to the work and insisted upon his right to continue it, until the Moore Construction Company took it over.

For the most part, the recitals of the certificate of the architect are fully and completely refuted and disproved by the plaintiff's evidence, and there is practically no contradiction thereof. Though the plaintiff was a contractor of twelve or fifteen years experience and a man of good character and

standing, he had never erected a reinforced concrete building; but he originally took the contract for the work in question, in connection with one George Iback, a man of considerable experience in that line of work, and, after Iback retired from the firm, or perhaps before, he employed M. M. Mathews as superintendent or foreman, and he was a competent concrete builder. Mathews and contractors of the city of Huntington, whose competency is not questioned, as well as certain engineers, all say the equipment Berry had on the ground and employed in the prosecution of the work was amply sufficient, and their testimony is not contradicted. One kind of material was lacking, namely, steel for reinforcement of the concrete, but the plaintiff charges his inability to procure that article to the failure and refusal of the architect to approve what are known as the "Shop Plans," prescribing the kinds and dimensions of the steel to be used for that purpose. Plaintiff's financial ability to procure the steel, after the date of the contract and commencement of his work and until about the date of the giving of the notice of default, is fully and clearly proved and established, if his shop plans had been approved by the architect. His case proceeds upon the theory, therefore, that the architect was the agent of the owners, and that they, by his wrongful conduct, prevented him from performing his contract and occasioned his financial embarrassment, the action taken against him by the surety in his bond and loss of the labor and materials he bestowed upon the work and the profits he expected to obtain by completion thereof.

Although a man of limited financial ability, the plaintiff held a contract with the Miller Supply Co., a concern of ample means, by which it obligated itself to furnish him materials, credit and protection to the extent of $86,500.00, in the prosecution of the work. The terms of the contract between the builder and the owner made it necessary for the former to carry all accounts for materials until sixty days after the completion and acceptance of the building, but the labor was to be paid for in an amount not exceeding $35,000.00, on estimates to be issued by the architect for work done in; (1), completion of excavation and the base-

ment walls; (2), completion of concrete work on the second floor; (3), completion of concrete work on third floor; (4), completion of concrete work on fourth floor; (5), completion of concrete work on fifth floor; (6), completion of concrete work on sixth floor; (7), completion of concrete work on seventh floor; (8), completion of roof; (9), completion of masonry; and, (10), completion of building ready for occupancy. Of the total contract price, $121,500.00, a portion, $2,500, was allowed the contractor for having "financed" the operation. He did that by procuring his line of credit with the Miller Supply Company.

The enterprise seems to have been started without adequate preparation therefor. As originally planned or designed by the architect, Wilbur T. Mills of Columbus, Ohio, the frame of the building was to have been of steel. Finding this plan more expensive than was anticipated or desired, the owners, under the architect's advice and supervision, let the contract to J. E. Berry and George Iback, doing business as the Iback Construction Co., on June 28, 1911, for a structure with a reinforced concrete frame. At that time no new plan providing for reinforced concrete columns, girders, floors and roof slabs seems to have been prepared, but the contract required them to be made of that material, and clause four of Article I thereof required the sizes and character of construction of these parts to be approved in writing by the architect, together with all construction details of the same, and prohibited the use in the building of those parts without such approval. Article II provided as follows: "It is understood and agreed by and between the parties hereto that the work included in this contract is to be done under the direction of the said Architect, and that his decision as to the true construction and meaning of the drawings and specifications shall be final and binding upon the parties hereto. It is also understood and agreed by and between the parties hereto that the Architect shall furnish such additional drawings and specifications as may be necessary to detail and illustrate the materials and labor required for the construction and completion of the above named work, and said parties hereby agree to conform to and abide by the same as a part of this

contract in so far as they may be consistent with the intent and purpose of the original drawings and specifications referred to in Article I.''

There is testimony tending to show that the drawings and specifications used in the letting of the contract were those prepared for the steel building, and that it was understood that a reinforced concrete frame was to be substituted for the steel frame, shown in the plans. In the specifications, there is a clause indicating that they were prepared before the contract was let and with a view to reception of bids thereunder. This clause reads as follows: ''The drawings are detailed for hollow tile reinforced joist construction but any contractor is at liberty to also bid on any standard system of reinforcing which has been in continuous use for at least four years, has completed buildings to refer to, and is approved by the architect, but in case any such system is used, the contractor must furnish detail drawings covering all of his work. These drawings to be submitted with the bids so that the architects and owner may be fully aware of the details of the system and construction to be employed. In any case, all details throughout this work must be made ample for loads indicated on the drawings, or stated herein, and shall include cover for excavated space under sidewalk.''

Notwithstanding the provision of Article II of the contract, respecting the duty of the architect to furnish drawings and specifications necessary to detail and illustrate the materials and labor required, the witnesses seem to agree that it was the duty of the contractor, to supply and furnish what are known as ''Shop Drawings;'' and, besides, one provision of the specifications reads as follows.: ''The contractor shall furnish the Architect with triplicate copies of all detail drawings of iron and steel work, and these drawings must be approved by the architect before any work is done at the shops. One approved copy of the drawings shall remain with the architect, one shall be returned to the contractor, and one shall be given to the inspector. The architect's approval of such shop drawings shall not be held to relieve the contractor from the responsibility for any errors which may be contained therein, due to variations from architects' drawings, incorrect dimen-

sion, errors of clearance, or connections. The responsibility for errors in shop drawings shall remain with the contractor."

Just when the work under the contract began is not disclosed by the evidence. As the contract with the Miller Supply Company required the contractors to execute a bond to the owners for the sum of $35,000.00 and this bond was never procured by the partners, Berry and Iback, it is quite likely the work did not begin until after the retirement of Iback. On January 22, 1912, Berry entered into a new contract with the owners, by which he took over the work, and he secured the bond required by the original contract. When the work was taken over by the Moore Construction Company, the plaintiff had completed all, or the greater part, of the excavation, put in all of the footers and done considerable work on the walls. In addition to this, he had put up the forms for the columns to the first floor. He estimates the value of the materials and labor put into the work, money expended in preparation therefor and materials and machinery left by him on the ground and used by the Moore Construction Co., at about $20,000.00.

The architect says in his testimony, he changed the plans from steel to reinforced concrete in the months of July and August 1911, but that he delivered floor plans, not a complete set, but floor plans, to Iback, June 23, a few days before the date of the contract; and that, on the 30th day of August, 1911, he delivered to the Iback Construction Co., six complete sets of the reinforced concrete drawings. On June 5, 1911, a date considerably prior to that on which the contract was entered into, Iback and Berry applied to Irvin and Witherow of Pittsburgh, Pennsylvania, a firm of engineers and agents or brokers in steel, for a quotation of prices of the amount of steel required for use in the reinforcing of the concrete to be used in the Huntington Masonic Temple, and they were quoted a price of $11,500.00 for it. At some time the architect must have been advised that the contractors expected to get their steel through this firm, for he says he furnished them a complete set of the drawings and specifications, November 23, 1911, and another, March 9, 1912. He claims also to have sent another to Irvin and With-

erow, January 27, 1912, and one to Berry March 1, or 2, 1912. The contractors expected to get their shop drawings from Irvin and Witherow and have them approved by the architect. This firm represented, as agents the Trussed Concrete Steel Company of Detroit, Michigan, a concern engaged in the furnishing of a certain kind of steel for reinforcement of concrete in buildings, known as the Kahn System or Kahn Bar, and they proposed to put in that system.

The date on which Irvin and Witherow sent their first set of plans to Mills is left in a state of uncertainty by the evidence. Irvin says it was discovered, when the drawings were practically completed, that it was necessary to have the architect's approval, that they were sent to him, and that after some unsatisfactory correspondence concerning them, he and Iback went to Columbus to see the architect. He says they were referred by him to his chief draftsman, Mr. Mair, and he, giving them no satisfaction, said he would not approve the plans because they were based upon the Kahn System. Irvin says he then laid the whole matter before the building committee of the Huntington Masonic Temple Association. He further says, and it is fully proven, that the association favored the plans. When Mills was advised of this, he insisted upon his release from their employment, in case they adopted the plans, and urged that, in such event, they require a guaranty from the Trussed Concrete Steel Company. With his letter, he enclosed a form of guaranty for execution by that company. On the 16th day of October, 1911, the Board of Directors of the Masonic Temple Association passed a resolution relieving Mr. Mills from responsibility respecting the reinforced concrete construction in the building, provided the Trussed Concrete Steel Co. should guarantee such construction in writing, and its sufficiency to sustain the loads prescribed in the specifications prepared by Mills, that such work should be done in accordance with the drawings of the firm of Irvin and Witherow, to be approved by the concrete company, and that there should be no change of the number of the concrete columns or the general lay out of the building. A copy of this resolution and a copy of Mills' letter were transmitted to the Trussed Concrete Steel Co. That

company executed and returned to them a guaranty, signed by M. Goldenburg, its manager of sales, agreeing to design all of the reinforced concrete required, in accordance with the standards of the American Society of Civil Engineers, and further agreeing that the design would calculate to carry dead loads together with the live loads required by the Mills specifications, naming them. They declined to execute the Mills guaranty, because it made them responsible for the work of installation. Thereupon, the Huntington Masonic Temple Association rejected the guaranty and reinstated, or continued, Mr. Mills in service. In addition to the formal guaranty tendered, the Trussed Concrete Steel Co. wrote a letter to the president of the Huntington Masonic Temple Association, assuring him that, if he decided to use the Kahn System, in accordance with the proposals made by Irvin and Witherow, the company would "make certain that every detail pertaining to the design of the structural features" could "be carefully studied, checked and approved." It further said: "Our reputation, which is based upon the success of twelve to fifteen thousand buildings, must be safeguarded most carefully. It would be the height of poor business to permit our materials and name to be used in connection with an indefensible design."

After the failure of this effort to obtain the adoption of the Kahn System, as proposed by Irvin and Witherow, without the sanction of the architect, negotiations between him and the Pittsburgh firm were renewed. A letter dated, November 7, 1911, from Irvin and Witherow to him, gave notice of the transmission of two copies of their drawings showing all details up to and including the first floor and pavement, saying this was done in accordance with an understanding had at Huntington on the preceding Monday. On November 23, Mills wrote them a letter, saying he was then sending them blue prints, and that, if the Kahn System was used, he would require net steel areas, at least, equal to those required in round rods, by his drawings. On December 19, 1911, they wrote another letter giving notice of the transmission of revised drawings of sidewalk and first floor. It says "These are entirely new drawings and we have endeavored to make

the steel in accordance with areas shown on your drawings. In some places your drawings do not show exactly what is required, but we have tried to place the same areas of steel in slabs and beams as you require in your drawings. If you will kindly go over this work and make any suggestions you may see fit, we will be glad to comply with the same and send you revised drawings at once." To this, Mills replied by letter dated, December 21, 1911, in which he pointed out a number of instances in which the steel areas given in "Revised drawings Nos. 188-A-1 and 188-A-2," were not equal to those prescribed by him. He further said they had ignored his arrangement of girders and beams enclosing the elevators and stairs. Irvin and Witherow replied, December 22, 1911, saying the architect seemed to have misunderstood the situation. Then, they explained that they could have had no motive or object in not furnishing all the steel he wanted, as it made no difference to them how much material was to be furnished, since the cost of any material, above their drawings, would have to be paid for by the contractor. They reminded him that they had said that, in some places, his drawings did not show exactly what was required, and assured him they had tried to follow his steel areas, and that they had requested him to go over the work and make any suggestions he saw fit, and they would then be glad to comply with the same and send him revised drawings at once. They further said "Your letter does not give sufficient information as to what you wish to make any further move in the matter and the contractor is very anxious to have the steel. Consequently if you will kindly follow our suggestion as above and mark on the print we sent you just what will be satisfactory to you, we will then revise our drawings and ship the material accordingly. Also if there is any beams that do not meet with your pleasure, kindly mark on our prints where you wish those beams located, how you wish them supported and what steel you wish in them." Mills replied, December 26, 1911, saying he thought his drawings, then in the possession of Irvin and Witherow, were sufficient to give all information as to areas of steel and how the material was to be placed, and then pointed out, by way of illustration, in-

stances in which, he said, his drawings would give all necessary information.

They replied, December 29, 1911, saying: ''We have your favor of the 26th regarding reinforcement and would say that this discussion could be kept up indefinitely. We cannot see why you cannot mark your requirements on our blue prints and thus settle the matter definitely and entirely. Hoping that you will follow this suggestion and mark your requirements on the prints and return the same to us, we are, Sincerely yours.'' On March 9, 1912, they wrote him again, saying they were sending, under separate cover, two blue prints of their drawing No. 188-A-2, being first floor plan of the building, and showing reinforcing steel. They said they had made the sectional area of steel as nearly as possible, from the information at hand, in accordance with his wishes. They asked him again to mark on one of the blue prints what would be satisfactory to him and return it to them, if it did not agree with his interpretation, and promised to change it to meet his notes. This is the last correspondence between the parties, found in the record. Both Irvin and Witherow swear that, after having failed to get Mills to accept their drawings founded upon the Kahn System, they caused another set of plans or drawings to be made in which round bars were prescribed, instead of the Kahn bar, in the hope that he might approve those drawings, and they say they made the steel areas in round bars fully equal to what he required in his drawings. These drawings were delivered about May 1, 1912, after the architect had advised removal of the contractor, but before he had been actually removed. A few days after the architect had written his certificate, reciting default on the part of the contractor, Berry went to his office in Columbus, Ohio, and requested him to make him a set of plans that would be satisfactotry, offering to pay for them, but he claimed to be too busy at that time. The witness says Mills then asked him if he had not received a letter stating that he had certified his default and that he, witness, replied by asking him why he had done that, whereupon he explained that the witness did not have the proper machinery and superintendent and that he thought it was useless for

him to try to put up the building, and also charged him with failure to procure the plans required. The witness also says he went to Marietta, Ohio, at about the same time, to see Mills, who was there on business, and that Mills avoided him and refused to see him.

Mills denies the delivery to him of any complete set of drawings. He says: "They never sent me anything that I would call a set of drawings at all. * * * Well at different times they sent me partial sets representing certain portions of the building only." He then criticizes and analyzes two of the sheets, one of which he received from Iback at about the date of the contract. He disapproved it because it provided for a square or rectangular, instead of the six-sided, footings contemplated by his original drawings. He admits these footings were subsequently changed, but he still objected to them, because they contemplated a footing composed of two blocks, a large one at the bottom and a smaller one at the top. He admits the footers actually put in the building were made in accordance with his design, and there is evidence tending to show the revised plans of Irvin and Witherow, criticised by him in his testimony, were made after the footings were put in. The plan itself bears an endorsement to that effect and disclaims responsibility as to them. Another criticism made in his testimony, is that one of the sheets seems to have wholly ignored his location of columns, as shown in his drawings, and to have provided for the extension of columns from the basement so as to make them come up into rooms above and so that one of them would obstruct a show window. Another objection stated in the testimony, was that he had received drawings only up to the second floor level and that he was unable to approve them, because the weight and thickness of floor plans for the stories above had a very important bearing upon the requirements as to sizes and strength below. In a letter to the owners, dated, November 9, 1911, Mills says the wrong location of columns, discovered in former drawings, had been corrected but that the rest of the work was substantially as it had been all along. He then said he simply could not conscientiously approve the lay-out of Irvin and Witherow, for the

building. He did not regard it as capable of safely carrying the loads specified. He also notified them that, if they drew a new contract, allowing the use of the lay-out of the Trussed Concrete Steel Company, he would insist upon the signing of his own release previously sent them. A copy of this letter was transmitted to Irvin and Witherow, and, then he said he would be glad to supply them with all the data they might need, if the owners decided to proceed with their materials. Nowhere in the correspondence is there any objection to the plans furnished by Irvin and Witherow, on the ground of incompleteness. Though he says that was one of the grounds of rejection, he does not say he so notified them, or gave them that as one of his reasons for rejection. Irvin says numerous revisions of plans were made, in the effort to satisfy the architect. Both Irvin and Witherow swear complete plans were sent him. One of the revisions for the first floor, dated, March 9, 1912, is based on the Kahn System and bears an endorsement saying: "This drawing made to conform to the design of W. T. Mills, Arct. all beams, sizes and steel areas, slabs depths &c are as designed by Arct." Neither in Mr. Mills' correspondence nor in his testimony, is there found any expression of approval or disapproval of this design. Another and last set of drawings submitted by Irvin and Witherow, about May 1, 1912, is based upon round steel instead of the Kahn System, and both Irvin and Witherow testify that the areas used are equal in all respects to those required by Mr. Mills in his specifications and drawings, and that they do not deviate in any respect from any clear requirements of said drawings. Mr. Mills never made any objections to them, nor does he say anything against them in his testimony, except that they are incomplete. Witherow says they covered the whole skeleton of the building. Irvin says no such objection was ever made, and that, on the contrary, Mills had told him he did not see why his draftsman could not approve the footings and first floor construction. None of Mills' letters show any such objection and some of them relate to partial drawings. A set of drawings put in evidence, as and for those last furnished cover all floors and

the roof.   They were proposed after the architect had certified Berry's default, but before he was removed.

As well may be supposed, in view of the cost, the quantity of steel to be used was a matter of importance.  The Trussed Concrete Steel Company had quoted Berry a price of $11,-500.00 for the amount required by their design.   They proposed to furnish him the steel required by the last plans submitted to them, which they say carried the quantity indicated by the architect's drawings, for $12,600.00.   Iback made the following statement to Mills in a letter dated, August 13, 1911:  "If the extra steel required according to Mair's figuring on footings, 14 to 24 is any criterion to go by, I am about $5,000.00 short in my estimate.   I have built 36 buildings of reinforced concrete 24 of them had the Kahn bar and designed by Kahn engineers.   I have always found them accurate and capable and as a rule furnishing more steel than was actually necessary."

On some date not definitely shown, engineers and contractors preferring a system patented by the Pittsburg Steel Products Company, were called in, Charles L. Petit, by Berry, and C. O. Gilbert, by the Masonic Temple Association. The former made an estimate for Berry, on the basis of the system just mentioned.   The latter examined the plans of Mills and the work done under them and made a written report to the association, which has not been produced and the exact terms of which are not known.   Both of these men found fault with Mills' plans.   They say they were deficient in strength and extravagant in cost.   The footings put in according to them were condemned and the Moore Construction Co. altered them at a cost of over $800.00.   Such drawings as may have been prepared by Petit, or such proposition as may have been made on the basis of his recommendation, were either not presented to Mills, or were rejected by him. The plans and drawings under which the building was put up by the Moore Construction Co., were prepared by the Pittsburg Steel Products Co., under the direction of Gilbert, and approved by Mills.   Both Petit and Gilbert seem to have come upon the ground some time in April 1912.   In a letter dated, May 3, 1912, the Pittsburg Steel Products Co. quoted

Berry a price of $9,935.00 for certain portions of the steel required, which did not include the footings, columns, sidewalk slabs, foundation walls, the suspended ceiling on the seventh floor, the structural steel required for the span roof trusses, the six columns supporting them, nor any angles required for supporting the exterior walls. The steel put into the footings and basement walls had already been purchased by Berry from the Trussed Concrete Steel Co., or Irvin and Witherow. What the balance of the steel excluded from the Pittsburg Steel Products Co.'s quotation would have cost, does not appear.

Mills says that on May 6, 1912, he suffered a nervous break down which affected his eyes and in consequence thereof he employed Gilbert in association with him, to finish the job. He paid Gilbert for the shop drawings made, under his supervision, by the Pittsburg Steel Products Co.

Admitting a preference for the Pittsburg Steel Products Co. system, Gilbert says the Kahn System is established and widely used. Petit says no system can be regarded as standard, but that the Kahn System is well established and very generally used. Neither in his testimony nor correspondence, does Mills condemn the Kahn System. Irvin and Witherow say it is in general use not only in the United States, but also in Europe, and that 10,000 to 12,000 buildings have been put up under it. It was used in some buildings erected in Charleston and Huntington, W. Va., before the Masonic Temple was built. It had been in use for at least ten years. That the Pittsburg Steel Products Co. had been in use only about two years, at the date of its adoption by Mr. Mills, and that company has since gone out of the line of business in which it was used.

At the conclusion of the evidence, the court gave two instructions, at the instance of the plaintiff, one of which told the jury he was entitled to recover, if, without fault on his part, he was prevented from carrying out his contract with the defendant by the arbitrary or capricious acts of the defendant or his architect. The other advised them that the law excused him from further performance of the contract, if they should find from the evidence that he had submitted

to the architect a complete schedule of the sizes and character of construction of all columns, girders and slabs, together with all construction details of the same, made by competent engineers, in all respects suitable for the purpose intended, and within the requirements and specifications offered in evidence in the case, and that the defendant's architect arbitrarily or capriciously refused to approve the same, in consequence whereof he was rendered incapable of performance of his contract. Objections to these having been overruled, the defendant excepted.

Of the six instructions requested by the defendant, the court gave five. The first told the jury the burden was on the plaintiff to sustain each and every item of his bill of particulars and that it should disallow any item not fully proved and established. The second advised them that he was not entitled to recover, if they should find from the evidence that, at any time prior to the 15th day of June, 1912, he became, through inability or otherwise, unable to perform his contract, and the Masonic Temple Association gave the surety in the bond notice to that effect, and that surety, pursuant to the notice, sublet the contract to the Moore Construction Co., unless they should find that company completed the building for an amount less than the price stipulated in the contract. The third told them they should allow the defendant credit for a judgment recovered against the plaintiff by a certain bank and assigned to the defendant and also for rent lost by delay in the construction of the building, if they should find the latter was entitled to recover. The fourth told them the architect had the sole direction of the work done under the contract and alone had the power to construe and give the meaning of the drawings and specifications under which the building was to be constructed, and that his decision, under the terms of said contract, was final and binding upon all the parties thereto, and that any deviation therefrom by either party, without his consent, was such violation of the contract as would forbid further construction of the building thereunder. The import of the fifth was that, if delays were caused by failure of the contractor to furnish shop plans, or by the non-approval of such plans

by the architect, they were delays of the contractor, and, if they occasioned lack of diligent and prompt prosecution of the work, the owners had right, on the certificate of the architect, to call upon the surety in the bond, to relet the contract, and there could be no recovery, in such case, unless the work was completed for less than the contract price. The sixth, refused, specified nine items of the bill of particulars, and, if given, would have directed disallowance of all of them.

Though no instruction requested by the defendant was predicated upon the theory of conclusiveness of the architect's certificate, on the question of failure of performance or delay on the part of the contractor, this proposition constitutes one of the grounds of argument in the brief, against the propriety of the court's action in the giving of the plaintiff's instructions, and in support of the contention that the verdict is contrary to the law. Article V of the contract, under which the certificate was made, does not in express terms, nor by implication, make the certificate conclusive of that question. Its terms make two facts conditions precedent to the right of the owner either to provide labor and materials, in default of provision thereof by the contractor, and deduct the cost from money due or to become due the latter, or to enter upon the premises and take possession of all materials, tools and appliances thereon, and employ other persons to finish the work. One of these is failure on the part of the contractor, and the other certification of the fact by the architect. It says the owners shall have these rights, if the contractor refuses or neglects to supply sufficient workmen or materials, or fails in any respect to prosecute the work with proper diligence, or fails to perform any of the agreements contained in the contract, and such refusal, neglect or failure is certified by the architect. There must be refusal, neglect or failure and no right is conferred upon the architect to certify them unless they exist. This provision does not say the owner shall have such right, on a mere certification of the architect that there has been refusal, neglect or failure, nor that his certificate shall conclusively established the fact against the contractor. It does not say he shall be the arbiter or umpire, as to that question. The

last sentence of the clause makes his certificate as to the expense incurred by the owner in the provision of materials or completion of the work and damages incurred through the default, conclusive, but its terms are not broad enough to include the certificate of refusal, delay or failure on the part of the contractor. It says the expense and damages shall be audited and certified by him, and makes his ''certificate thereof'' conclusive and binding. It ends with expenses and damages. That portion of the clause which says the owner may terminate the employment, if the architect shall certify that such refusal, neglect or failure is sufficient for such action, seems to make the architect's opinion as to the gravity or extent of the default controlling, but it assumes the existence of the default. It is subsidiary and follows a provision making the existence of default a condition precedent, without reference thereof to the architect's opinion, and is limited by its terms to the question of character, extent or gravity. The two things are totally and radically different, one being the basis of the owner's right to interfere at all and the other the character of the interference. The former is fundamental, basic and determinative of right and the latter merely incidental and operative in the execution of the right. It refers to the former as having previously occurred, saying ''such refusal, neglect or failure.''

In *Engineering & Construction Co.* v. *Butler*, 165 Cal. 497, the court seems to have held an architect's certificate, made under a clause like the one here involved, to be conclusive upon the contractor, but, in as much as no sufficient certificate had been made, the holding is a mere *obiter dictum*, and, besides, it is based upon no authority directly applicable to the question. In a case note to *Improvement Company* v. *Marysville*, 23 L. R. A. N. S. 317, the annotator, reviewing a large number of cases, says an engineer's certificate of approval of work done for a city, is not conclusive against the city unless the contract plainly provides that it shall have this effect. Analyzing the effect of such a certificate, as to the contractor, he says: ''But where there is no provision that the decision shall be final, it does not have this effect.'' As several of the cases there cited distinctly show,

a provision in a contract making an architect or an engineer the arbiter between the parties, is strictly construed and the power conferred thereby limited to the particular matters brought within its terms. This clause of the standard building contract falls under the rule of strict construction. When there is default, it is the duty of the architect to determine which of the two certificates contemplated is called for, and, on this subject, the court said, in *Valente* v. *Weinberg,* 80 Conn. 134, 137: "Of this the architects were to be the judges, and to justify the defendant in taking either proceeding, and especially the harsh one of terminating the plaintiff's employment, taking his tools and materials and turning the completion of the contract over to a third party beyond the plaintiff's control but at his expense, the provisions of article five, strictly construed, should be strictly pursued. *Wilson* v. *Borden,* 68 N. J. L. 627, 629, 54 Atl. 815; *Champlain Const. Co.* v. *O'Brien,* 104 Fed. Rep. 930, 933; *Spencer* v. *Duplan Silk Co.,* 112 Fed. Rep. 638, 641." A clause in a paving contract required the work to be done to the satisfaction and approval of an engineer or superintendent and provided for payments on the engineer's certificates. A plea to a declaration on the contract, alleging breaches thereof and resultant damages, averred that the work had been completed to the satisfaction and approval of the engineer and superintendent and had been approved by both of them, but it was held bad, the court saying, among other things, "The contract does not make the certificate of the engineer or general superintendent conclusive upon the question of the fulfillment of the contract according to its terms." *Newark* v. *Asphalt Co.,* 68 N. J. L. 458. It did not say the certificate should be conclusive. A like holding is found in *Sterling* v. *Hurd,* 44 Colo. 436. These are instances of strict construction against the contractor and of the requirement of words in the contract expressly making the certificate conclusive. There is no reason why the rule should not apply in his favor. An excavation contract provided for payments on estimates by an engineer and full payment on his final estimate, but did not say his estimate should be conclusive, and it was held not to be so. *Sherman* v. *City of*

*New York,* 1 N. Y. 316. To the same effect, see *West Chicago Park* v. *Schillinger,* 117 Ill. App. 525. When the contract does make the certificate conclusive, the decision of the architect does not extend beyond the matters to which it is made expressly applicable. *King Iron Bridge Co.* v. *St. Louis,* 43 Fed. 768, 10 L. R. A. 826; *Salt Lake City* v. *Smith,* 43 C. A. A. 637; *Drhew* v. *Altoona,* 121 Pa. 401; *Burke* v. *New York,* 7 App. Div. 128. No fault is found with the legal proposition stated in the brief filed by the plaintiff in error, that it is competent for the parties to a contract to provide for recission thereof. The authorities cited for it fully sustain it, but none of them go to the extent claimed here. In *Maloney* v. *Malcolm,* 31 Mo. 45, the default was admitted, and the defense was predicated upon the lack of a formal declaration for forfeiture, which the court very properly held unnecessary. In *Henderson Bridge Co.* v. *O'Connor & McCulloch,* 89 Ky. 303, the contract provided for annulment by the bridge company, if the contractors should fail to comply with and perform all of the terms of the contract, or in case it should "appear to the engineer" that the work did not progress with sufficient speed or in a proper manner. From the use of the words "appear to the engineer" the court construed the contract as one making the right of annulment depend merely upon the opinion of the engineer. No such language is found in this contract. In *Curnan* v. *Railroad Co.,* 138 N. Y. 480, the contract gave the owner absolute right and power to suspend the work for any reason. In *Faunce* v. *Burke & Gonder,* 16 Pa. 469, the contract was like the one under consideration in the Kentucky case above mentioned, and the court said the effect of the terms used was to make the opinion of the engineer conclusive as to the progress. In *Warren-Sharf Asphalt Paving Co.* v. *Laclede Const. Co.,* 111 Fed. Rep. 695, the contract gave the employer absolute right to discontinue and suspend the work at any time. In *Mitchell* v. *Dougherty,* 86 Fed. Rep. 859, the contract made the architects and engineers final arbiters in all disputes relative to and touching the contract, and both parties waived any right of action, suit or other remedy in law or otherwise.

The purpose of the clause under consideration is very plain and simple. In the absence of such a provision, the owner could not furnish materials and employ labor by way of facilitation of the progress of the work, and deduct the cost thereof from the contract price. Nor could he take possession of the work, in case of delay, and appropriate the contractor's machinery and materials. It is not necessary to say just what remedies he would have. It suffices to say he could not do these things. The purpose of this provision of the contract is to enable him to do them, in case of default, and the provision for the architect's certificate is a measure of protection to the contractor. Default alone, by the terms of the contract, does not authorize the owner to supply labor and materials or take over the work and the contractor's machinery and materials. He must have the certificate in addition to the default. Thus interpreted, the provision performs an important function. To give it effect, it is not necessary to go beyond its terms and say it makes the architect's certificate evidence of the default. The parties might have so provided, but they did not.

Omission of the element of fraud or bad faith on the part of the architect, in the hypothetical recitals of facts, found in the instructions given for the plaintiff, is another ground of complaint. All authorities agree that an architect's honest judgment, when made conclusive by the terms of the contract, cannot be set aside or overthrown. Sometimes his finding is said to be conclusive, in the absence of fraud or bad faith, but the courts generally add other elements, such as failure to exercise an honest judgment and capriciousness and arbitrariness. Failure to exercise an honest judgment is recognized in the following cases: *Kihrlberg* v. *United States,* 97 U. S. 398; *Sweeney* v. *United States,* 109 U. S. 618; *Construction Co.* v. *Granite Co.,* 90 Miss. 16. This expression probably means fraud or bad faith, and may be so defined in the decisions in which it is found. In *Ripley* v. *United States,* 223 U. S. 695, a different statement of the rule is found and it plainly goes beyond this definition, saying: "But the very extent of the power and the conclusive character of his decision raised a corresponding duty that

the agent's judgment should be exercised—not capriciously or fraudulently, but reasonably and with due regard to the rights of both the contracting parties." Dishonest, fraudulent or merely arbitrary action is declared to be sufficient in *Wendt* v. *Vogel*, 87 Wis. 462. Lack of a certificate of completion of work does not preclude right of recovery, if it is shown to have been unreasonably withheld by the architect. *Bush* v. *Jones*, 144 Fed. 774; *Michaelis* v. *Wolf*, 136 Ill. 68; *Flintie Stone Co.* v. *New York*, 160 N. Y. 72; *Happel* v. *Marasco Co.*, 75 N. Y. Supp. 461; *Schimdt* v. *North Yakima*, 12 Wash. 121. Recovery was refused in *Ashley* v. *Henahan*, 56 O. St. 559, for lack of a certificate, but Minshall, Judge, said: ''Had the plaintiff shown that he made application to the architect for the certificate, and that he had obstinately and unreasonably refused to certify, he might then have established his case by other evidence.''

These and many other decisions propound the doctrine that full performance of duty on the part of the contractor and arbitrary, capricious or palpably unreasonable refusal on the part of the architect to accept it, are facts sufficient to justify a jury in setting aside, overthrowing or ignoring the architect's decision. He is selected as an arbiter because of his supposed ability, skill and fairness and it is his duty faithfully to apply and use these superior qualities in the determination of questions arising between the parties. To permit him to lay them aside and conform his actions to his mere whims and caprice and exclude reason and sound judgment from his procedure and findings, would defeat the very purpose of his selection. As suggested by the federal Supreme Court, the extent of his power necessitates requirement of care and due regard for the rights of the parties, in the exercise thereof. There is no appeal from his decision properly rendered in a matter within his powers.

Any clear and palpable failure of duty on the part of an architect, respecting a matter submitted to him for decision, will invalidate his certificate or finding. In *Parr* v. *Howell*, 74 W. Va., 413, a certificate of expense, made under a building contract, was set aside because it was not founded upon an actual audit of the expense. There may have been no

fraud or bad faith, in the certification, but there was an obvious omission of high duty, and the contractor was not bound by a certificate arbitrarily given. He had as much right to have the certificate against him founded upon a faithful performance of duty, as the owner had to require such a certificate to be made. The contract had two sides. It was made for both parties. It made the architect a judge, not a dictator. In *Wilson* v. *Borden,* 68 N. J. L. 627, the court said the architect occupied a judicial position as to the parties, and was bound to act impartially upon his own judgment. An offer by the architects in that case to certify the contractor's delay, if the owners wished them to do so, was condemned and treated as an element or ground of invalidity of their letter relied upon as a certificate.

*Plumbing Co.* v. *Carr,* 54 W. Va. 272 and *Barrett* v. *Coal Co.,* 51 W. Va. 416, are distinguishable. They involved demands for balances alleged to be due for completed work. The subject matter of one was a plumbing system in a house, and of the other, brick. In the former case, the contract required completion of the work to the satisfaction of the owner and architect, and, in the other, to the satisfaction of the general superintendent or his authorized representative. Defects in the plumbing could have been corrected or the system removed and the brick could have been sold in the market. This is a working contract, giving right to perform the work on certain conditions, entailing expense of preparation and permitting large expenditures in execution, before the occasion for determination of disputes or prescription of conditions by the architect, arises. Arbitrary or capricious action on the part of the architect, or action without a shadow of reason or cause, preventing execution of the work, would inevitably cause heavy and irremediable losses, if it were binding. The architect representing the owner is, in a broad sense, a co-worker with the contractor. They are not wholly independent, nor is it possible for them, consistently with the purposes of the contract, to stand aloof from one another and refuse cooperation. The architect's decisions rendered in the course of the work, even when just, fair and correct, necessarily interfere to some extent with the progress thereof.

In the two cases, just referred to, there was no such interference. The contractors assumed all responsibility, executed the work in their own way, and having reserved these rights, bound themselves to make the final results satisfactory to the other parties. Here the contractor assumed obligations to do things in which the owner, through the architect, was to participate, or that could be done only under conditions to be fixed by the owner in that way. The contract contained dependent covenants, or conditional undertakings, operative throughout the progress of the work. In the other cases, the contractors were free to adopt and pursue their own methods and do the work in their own respective ways, provided they should effect certain ultimate results satisfactory to the other parties.

In so far as the instructions given for the plaintiff state law to be considered in the abstract, they are sustained by the weight of authority as well as reason. If the architect's action respecting proposed shop plans can be properly considered as falling within his powers as arbiter between the parties, there was evidence tending to prove capriciousness, arbitrariness and lack of reason. The system on which they were based was established by long and extensive use and had the approval of engineers generally. His objection on the ground of meagerness of steel areas was met and overcome, if the testimony of the witnesses for the plaintiff is true, and the same may be said of his requirement of round rods, if he required them. There is evidence tending to prove he declined to pass upon the plans proposing them at all, and that he made no response to the last offers to increase the sizes of the Kahn bars. He says his drawings were sufficient to enable the contractor's engineers to tell what areas were required, in all instances. They say they were not. Obviously, this state of the evidence justified the giving of the instructions.

The architect acted in two closely related capacities. He was agent of the owners, and, at the same time, the arbiter or umpire as to certain matters that might arise between the parties. It was his duty, as agent, promptly to prescribe such conditions as the owner had reserved the right to pre-

scribe. In those instances in which, it was the duty of the contractor to propose plans for approval or disapproval, the owner was equally bound to act upon his proposals and say whether they were satisfactory or not, and, in the latter event, he was bound to allow reasonable time for modifications, alterations or new proposals. It would be utterly unreasonable to say the contractor bound himself to insure acceptance of his first draft of shop plans, or denied himself the right and time for modifications or second or even third proposals thereof. The owner designated the architect to act for him, in passing upon the shop plans, wherefore the latter was, for such purpose, his agent. If he, as such agent, omitted any duty causing delay or injury to the contractor, his principal, the owner, was liable for the consequences, whether the omission was fraudulent or not. In such case, the motive is wholly unimportant, and the only question is, whether the contract has been broken. *Mosler Safe Company* v. *Maiden Lane Safe Deposit Company*, 199 N. Y. 479, 37 L. R. A. (N. S.) 363. The contract here under consideration devolved upon the contractor the duty of making shop plans for construction that would effect certain results. It gave him also the reciprocal right to make and propose them. He could not be deprived of his contract and subjected to loss of money and labor bestowed upon the work, either in actual execution therefor, by delay in action upon his proposals of plans, upon merely arbitrary and captious objections, nor by refusal to consider and pass upon new or modified plans offered within a reasonable time, after rejection of plans disapproved. As to the plans, the owners did not reserve to themselves absolute and unrestricted power. In casting some of the duty respecting them, upon the contractor, they necessarily delegated or conceded to him, a measure or modicum of power and dominion, exercise of which they were bound to allow. If the architect denied or precluded the right so granted, he acted as the agent of the owners in doing so, whether his motive in the act of denial, interference or obstruction was good or bad, and purity of his motives does not absolve his principals from liability for consequences injurious to the contractor.

The evidence tends strongly to prove misapprehension or neglect of duty on the part of the architect, in his capacity as agent, and causal relation between his omission of duty in that capacity and the failure of the contractor. He seems to have considered his disapproval of the plans first submitted as final and as amounting to full performance of his duty to the contractor, though he did communicate further with them on the subject. In this, however, he seems to have thought he was merely extending courtesy or grace in the premises. The contractor's engineers swear they sent him revised plans, March 9, 1912, carrying the amount of steel he required, and that about May 1, 1912, they sent him a set of plans based on round rod reinforcement, and he neither approved nor disapproved them. There is no proof that he considered either of them at all. The revised drawings of March 9, 1912, were sent, if at all, before he certified the contractor's default. The others were sent after the date of the certificate, but a month and a half before the contractor was actually ousted from the work. Berry carried some indebtedness at the time of the making of his contract, but his credit was good nevertheless. There is no evidence of pressure by his creditors until some time in April, 1912. It cannot be said, as matter of law, that his financial embarrassment was such, even in May, 1912, as to preclude performance of his contract, if he had then been relieved of the handicap imposed upon him by lack of working plans and drawings. He attributes his delay to that and says it broke down and destroyed his credit. Whether removal of the handicap would have sufficiently repaired the injured credit to permit performance of the work, is a question for a jury rather than a court. The objection to plans furnished on the ground that they were incomplete is not conclusive. Partial plans were received and considered, a circumstance strongly indicating that completeness was not deemed an essential requisite. It is not to be assumed that the upper floors would have been made heavier than the specifications called for, wherefore the reason assigned for the objection is not very forceful.

In our opinion, the evidence is sufficient to sustain the jury's finding of ground of liability.

Defendant's instruction No. 6 was properly refused. At least one of the items was a proper charge, namely the one for the costs of plans and specifications. That was money expended or a liability incurred on the faith of the contract, even though the plans were not accepted. The contract imposed the duty of proposing plans, and, if the architect had properly performed his duty, the money so expended would have been saved, or the liability therefor, it not having been paid, would have been discharged out of the compensation. Whether the architect did perform his duty was a question for the jury.

The plaintiff is not limited in his recovery to the value of the work performed, materials furnished and expenses incurred. If he could prove profits or gains wrongfully prevented, he was entitled to them also. *Hare* v. *Parkersburg*, 24 W. Va. 554; *State ex rel. Mundy* v. *Andrews*, 39 W. Va. 35, 40; *Electric Supply etc. Co.* v. *Light and Railway Co.*, 42 W. Va. 583, 586; *Beatty Lumber Co.* v. *W. U. Tel. Co.*, 52 W. Va. 410, 417; *Barrett* v. *Coal & Coke Co.*, 55 W. Va. 395. To allow the contractor only his labor, materials and expenses would deny him the benefit of his contract. He would get back only what he has laid out. To return this to him and give him such profits as he could have made, is perfectly consistent, reasonable and just, and no authority cited or found, properly read and interpreted, denies right thereto.

The argument submitted to show excessiveness of the verdict is founded largely on the false basis of recovery contended for by the defendant. In this, it is virtually admitted, and the evidence proves, over $10,000.00 could be allowed for labor, materials and expenses, if there is right of recovery at all. An addition of $15,000.00 to this for profits lost, is well within the testimony as to the expectation of profits. The plaintiff proves his estimate of complete cost to have been under $100,000.00 and the contract price was $119,000.00 with an allowance of $2,500.00 for "financing" the proposition. That the entire contract price was expended in the work of completion, is a circumstance tending to show the

estimate was too low and that no profits were possible, but
that is not conclusive, nor is the certificate of the architect
that the entire contract price was required for completion of
the work. That certificate does not conclude as to a breach
of the contract by the owner. It cannot be extended to cases
or situations lying beyond its terms and purpose. No at-
tempt was made to show lack of profits, by any other
evidence.

No error in the judgment having been perceived, it will
be affirmed.

Ritz, Judge, *(concurring:)*

I concur in the conclusion that the judgment of the circuit
court should be affirmed, but I cannot agree to the construc-
tion placed upon the provision of article V of the contract.
This article provides that in case of failure of the contractor
to furnish sufficient materials, etc., the same being certified
by the architect, the owner may furnish at the expense of
the contractor such material as is necessary to comply with
the requirements of the contract in that regard; or should
the architect certify that such default is sufficient to war-
rant the dismissal of the contractor, the owner may do so and
take over the work together with the contractor's tools,
equipment and material, and complete the work for the ac-
count of the contractor.

This provision fixes the rights of the parties under the
contract in case of a default, but it goes further and pro-
vides how such default shall be shown, that is to say, by the
certificate of the architect. The question of when a default
has occurred in contracts of this character is one difficult of
proof when it comes up for determination in a suit after the
building has been completed, so the parties themselves have
provided how the same shall be proven. It cannot be proven
in any other way than by the architect's certificate as pro-
vided by the contract, and when such certificate is produced
it is conclusive upon both parties, unless the complaining
party overthrow it by showing that it was procured by fraud,
mistake or collusion, or was issued by the architect in the ar-
bitrary, despotic or capricious exercise of power, and the

obligation is upon the party who would overthrow the certificate to make this showing.

Judge WILLIAMS agrees with the views expressed in this note.

*Affirmed.*