PER CURIAM:
Vecellio & Grogan, Inc., a West Virginia corporation (hereinafter “V&G”, brings this action against the West Virginia Division of Highways (hereinafter “D/H”) for damages resulting for an alleged breach of a highway construction contract between them, which called for excavation and construction on Project ID-77-2(50)77 at the Sharon Interchange of the former West Virginia Turnpike but now Interstate 77, in Kanawha County, West Virginia.
The contract, dated 31 May 1993 is divisible, one part relating to excavation and removal of unclassified material, and one part relating to new road construction. Performance by V&G was to be complete by 13 July 1986, without intermediate completion dates as to either part. The construction part of the whole contract is otherwise irrelevant to this proceeding.
By the terms of the excavation contract, V&G was to remove an estimated 1,469,926 cubic yards of unclassified material, consisting of rock, shale, and dirt, from its place in nature along the easterly side of the Turnpike, a two-lane road, to the end that the planned Interstate highway would be wide enough to accommodate two lanes of traffic in each direction.
In preparing its bid of $4.25 per cubic yard of material excavated and removed, V & G took into consideration the fact that the cost of excavating rock and shale, the greater part of the mass to be removed, was appreciably higher than the cost of removing dirt, but the bid price, accepted by D/H represented a blend of costs for all materials.
It was necessary for D/H to maintain the flow of traffic over the Turnpike during the period of construction, and it was provided in the contract that V&G should not have the right, in removing excavated material, to go upon or cross the Turnpike with its hauling trucks. Accordingly, V&G devised and put into operation a system for material, under which it started excavation operations at the southerly end of its excavation sector, removed the excavated material by trucks in a southerly direction, and, as the face of the excavation operations advanced in a northerly direction, the newly excavated material was removed by trucks over the already excavated area, southward.
The northerly end of the sector awarded to V & G for excavation abutted upon a *148 sector designated as Project ID-77-2(51)80, upon which the Nello L. Teer Company (hereinafter “Teer”) was to perform excavation and construction under a contract dated 17 June 1983. Apparently, by mistake, the northerly end of V & G’s area of responsibility was also included in the Teer contract, although it had already been awarded to V & G. Teer was informed by D/H, by letter dated 5 August 1983, that excavation of the “overlap” area would be performed by V & G, and Teer’s contract was amended to reflect the deletion.
V & G conducted excavation operations in 1983 until weather conditions forced it to suspend operations until the following spring. By 18 September 1984 it had completed more than two-thirds of its excavation work and was then moving northward through rock, which it had to excavate and remove in order to gain access to the northern area of its excavation responsibility, the “overlap” area. Supervisory personnel of V & G testified that they then estimated that, at the rate work was proceeding, V & G would reach the “overlap” area in November 1984, and that thereafter the unclassified material, which was stipulated to be mainly dirt, and containing 62,745 cubic yards, could have been removed at the rate of 3,00 cubic yards per working day, or about 21 working days.
On 18 September 1984, at a meeting convened by D/H and attended by representatives of V & G then present, was asked by a representative of V & G then present, was asked by a representative of D/H weather V & G could then move the material in the “overlap” area, and Smith’s reply was that V & G could not do so at the time, as it was obvious that V & G had not yet reached the area by excavating in that direction. Thereupon, on the same day D/H took the “overlap” area from V & G and awarded it to Teer excavation, over the protest of V & G. Teer thereafter proceeded to excavate and remove the dirt from the “overlap” area, completing the work well before the end of 1984.
D/H attempted to justify its decision to take the work from V & G and award it to Teer, by asserting a right to do so under the provisions of Sec. 104.2 of the Standard Specifications for Roads and Bridges, made part of the contract and providing in pertinent part as follows:
“104.2 - Altercation of Plans or Character of Work.
The Department reserves the right to make alterations in the Plans or in the quantities of work as may be necessary or desirable at any time either before or during the work under the Contract. Such altercations shall not be considered as a waiver of any conditions of the Contract nor shall they invalidate any of the provisions thereof, except as provided herein.”
The Department may omit any item or items in the Contract, provided that notice of intent to omit such item or items is given to the Contractor before any material has been purchased or labor *149 involved has been performed, and such omission shall not constitute grounds for any claim for damages or loss of anticipated profits. The Department may omit any item or items shown in the Proposal, at any time, by agreeing to compensate the Contractor for the reasonable expense already incurred and to take over at actual cost any unused material purchase in good faith for use for the item or items omitted. ...”
We do not agree with the construction sought by D/H for the word “omit”, for the following reasons:
(a) the language of the specifications is plain and unambiguous, the word “omit” being commonly understood to refer to something deleted and not to something taken from one’s contract and handed to another for performance; see Burke v. Board of Improvement Paving District No. Five, 179 S. W. 654, (Ark. 1915); and Gallagher v. Hirsh, 61 N.Y. S. 609 (App. Div. 1899);
(b) from the record it is quite clear that V & G was well advanced in its performance and that it received no notice from the D/H of the latter’s intent to take the work from V & G;
(c) were the interpretation sought by D/H to be accepted generally, building contracts would be so uncertain and risky, not to mention litigious, as to create unsettled contracts and an unmanageable condition in the industry.
We conclude that the excavation contract of 31 May 1983, between D/H and V & G was unjustifiable breached, in part, by D/H, by its making further performance by V & G impossible, and that V & G is entitled to such damages as were caused by the breach of contract. We proceed to a consideration of the proper measure of damages.
In Restatement, Contracts 2d, it is provided in pertinent part:
Sec. 344. Purposes of Remedies
Judicial remedies under the rules of this Reinstatement serve to protect one or more of the following interests of the promisee:
(a) his “expectation interest,” which is his interest in having the profit of his bargain by being put in as good a position as he would have been had the contract been performed;
*150 (b) his “reliance interest,” which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract been performed; or
(c) . . . .
In Restatement, Contracts 2d, it is provided in pertinent part:
Sec. 347, Measure of Damages in General
Subject to the limitations stated in Secs. 350-53, the injured party has a right to damages based on his expectation interest as measured by:
(a) the loss of in value to him of the other party’s performance caused by its failure or deficiency, plus
(b) any other loss, including incidental or consequential loss, caused by the breach; less
(c) the cost or other loss that he has avoided by not having to perform.
The Restatement makes the comment that Sec. 347 attempts to put the injured party in as good a position as he would have been in had the contract been performed, that is, had there been no breach.
Consistent with the Restatement, Contracts 2d, Secs. 344 and 347, are the following decisions of the Supreme Court of Appeals in West Virginia:
Polino v. Kech, 80 W.Va. 426, 96 S.E. 665 (1917);
Berry v. Huntington Masonic Temple Ass’n., 80 W.Va. 342, 93 S.E. 355 (1917); and
Franklin v. Pence, 128 W.Va. 353, 36 S.E.2d 505 (1945).
See also 22 Am. Jur. 2d 692, Damages Sec. 63.
Applying the rules of said authorities to the facts of this case, we find and conclude that:
(1) D/H unjustifiably refiised to permit V & G to perform that portion of their contract for excavation dated 31 May 1983, which related to the unclassified material in the “overlap” area.
(2) as a result of the breach of contract aforesaid, by D/H, V & G sustained *151 damages measured by the sum which it would have been entitled to receive if it had been permitted to perform the excavation in accordance with the contract, less the cost it could have avoided by not having to perform;
(3) V & G would have received the sum of $266,666.25 from D/H completion of excavation of the “overlap” area, a sum which is realized by multiplying $4.25 (the amount agreed to be paid per cubic yard of unclassified material removed) by 62,745 (the number of cubic yards removed from the “overlap” area);
(4) against the sum of $266,666.25 which V & G would have earned had it been permitted to perform, D/H is entitled to an offset of $2,066 per cubic yard, representing the sum of costs of performance by V & G had it been permitted to perform, stated in amounts per cubic yard, for the following:
(a) payroll labor $0,375
(b) payroll taxes 0.129
(c) support personnel, greasers, mechanics, et al. 0.280
(d) depreciation of company-owned equip. 0.268
(e) fuels and lubrication 0.137
(f) tires and tubes 0.019
(g) supplies 0.071
(h) rental equipment 0. 061
(i) field supervisory personnel 0.296
(j) business and occupation tax • 0.083
(k) contingencies 0.248
Total $2,066
Items of performance cost (a) to (g), above, are taken from V & G’s Exhibit 30, to the admission of which D/H did not object to which d/H offered no countervailing evidence. Items (j) and (k) are taken from other portions of the record.
(5) The cost of performance of & G, therefore, in excavating the over-lap” area would have been the product of multiplying the composite cost per cubic yard, $2,066, by the number of cubic yards stipulated to have been removed, and that product is $129,631.17;
(6) The damages sustained in this case, by V & G, the injured party, consist of the difference between its contractual expectancy, $255,666.25, and its costs of performance of that portion of the contract which it was prevented from performing, or $129,631.17, and that difference is $137,035.08.
*152 Damages of $137,035.08 will put V & G in as good a position as it would have been in had the contract of 31 May 1983 been performed, that is, had there been no partial breach of that contract.
The Court is of the opinion that §109.8 of the Specifications does not apply as the instant claim is based upon a breach of contract rather than upon worked performed. Therefore, V & G recover interest on $137,035.08 in accordance with the provisions of W. Va. Code §14-3-1, in effect at the time of the making of the contract by the parties. V & G may recover interest at 6% per annum from the 151st day after 15 March 1988, through 18 November 1992, the issue date of this opinion. Award of $137,035.08, plus interest in the amount of $35,095.24, for a total award of $172,130.32.
Award of $137,035.08, plus interest in the amount of $35,095.24, for a total award of $172,130.32.
Award of $172,130.32.