# Richmond

CITY OF RICHMOND V. A. H. EWING'S SONS, INCORPORATED.

June 13, 1960.

Record No. 5103.

Present, Eggleston, C. J., and Spratley, Buchanan, Miller, Whittle and I'Anson, JJ.

The opinion states the case.

*James A. Eichner* (*J. E. Drinard*, City Attorney, on brief), for the plaintiff in error.

*Walter E. Rogers* (*Williams, Mullen, Pollard & Rogers*, on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

A. H. Ewing's Sons, Incorporated, filed a motion for judgment against the City of Richmond in the court below claiming damages for the alleged breach by the city of a contract which the parties had entered into for the construction of a juvenile detention home on a site owned by the city. After the city had filed its grounds of defense the case was heard by the court without a jury and resulted in a judgment in favor of the plaintiff against the city for the sum of $47,393, with interest. Appealing from this judgment, the city assigns a number of errors which question both its liability and the quantum of damages allowed.

The underlying facts are not in dispute. A. H. Ewing's Sons, Incorporated, a general contractor, and the City of Richmond entered

into a contract dated May 31, 1956, for the construction of a juvenile detention home, at the agreed price of $262,869, on property owned by the city at the northeast corner of Forest Lawn Road and Old Brook Road in the city of Richmond. The site for the proposed facility had been approved by the City Manager and the city council. On June 5 the contractor applied to the Commissioner of Buildings for a building permit, which was denied on the ground that the erection of the proposed structure on the site was not permitted by the city zoning ordinance. The city appealed this decision to the Board of Zoning Appeals. The Board at first denied the appeal, but upon a rehearing on July 2, granted the permit provided the detention home building and playground area be set back at least 440 feet from Old Brook Road, instead of 130 feet as had been originally contemplated.

On July 6 the Wicker Apartments, Incorporated, the owner of near-by property, appealed from the Board's decision to the Law and Equity Court of the City of Richmond, and obtained an injunction from that court restraining the city and the contractor from constructing the detention home on the approved site. This injunction expired by its terms on October 1. On October 3 the Law and Equity Court entered an order affiming the order of the Board of Zoning Appeals and from that order Wicker Apartments appealed to the Supreme Court of Appeals. On September 6, 1957, the appellate court affirmed the order of the lower court. *Wicker Apartments, Inc.* v. *City of Richmond*, 199 Va. 263, 99 S. E. 2d 656.

Pending the Wicker Apartments appeal, several conferences were held and correspondence passed between the city officials, the contractor and the architect with respect to the status of the construction contract. On July 13, 1956, the Assistant Director of Public Works advised the architect and the contractor as follows:

"All work on this project is to come to a complete standstill except the engineering required to complete the design in the new site location. Also any design changes that may be necessary should be undertaken and completed.

"As soon as legal action regarding this project is resolved, this office will advise you further on the future course of action to be pursued."

In reply to this letter the architect wrote the contractor, stating: "You are accordingly requested to stop all purchasing of any ma-

terials for this project and all work is to come to a complete standstill pending outcome of legal action being undertaken by the Owners."

On July 18 the contractor wrote the Director of Public Works confirming the understanding that the contractor was ready, willing and able to proceed with the contract but was "prevented from doing so at this time by the injunction," and that "any additional costs occasioned by the delay would be borne by the City." In reply to this letter the director wrote the contractor that this statement "is proper for it is certainly our intention that you as the contractor should suffer no loss due to the situation that has developed over which you had no control."

During the pendency of the Wicker Apartments appeal, in reply to a letter from the contractor, the contractor was told that after a decision in that case, which was expected in September, 1957, the city would be "in a better position" to answer the inquiries which the subcontractors were making of the contractor as to the status of the project.

After the decision of the appellate court on September 6, affirming the legality of the issuance of the permit by the Board of Zoning Appeals, there was some uncertainty as to whether the city would proceed with the contract. In a letter dated September 19, 1957, to counsel for the contractor, the City Attorney, after referring to the provisions in the contract under which the city and the contractor had the right to terminate it, requested that he be advised "whether Ewing expects to proceed with the work;" whether it would "exercise its rights, if any, under the contract" because the work had been stopped "through no act or fault of Ewing;" "should the city insist upon proceeding with the work, what claims, if any," the contractor would assert against the city on account of the delay in the performance of the contract; and "should the city exercise its rights to cancel the contract," what claims the contractor would make against the city.

Counsel promptly replied that the contractor was still ready, willing and able to proceed with the contract, as it had been all along; that the contractor had entered into firm contracts with subcontractors for work to be done on the project; and that without information from them the contractor was unable to say what claims it would assert against the city in the event the city decided to cancel the contract.

Shortly after the receipt of this letter a conference of the parties was held, at which it was decided that all pending matters should

be postponed until the city had determined whether it would proceed with the project. On December 4, 1957, the City Attorney wrote counsel for the contractor as follows:

"After public hearings and informal discussions, it appears that the Council will abandon the project for the construction of the juvenile detention home on the Pine Camp property, although it has not taken final action with respect thereto.

*"It is recognized that the City has a binding contract with A. H. Ewing's Sons, Incorporated, for this construction.* Will you please advise this office in detail of the damages or compensation the contractor expects to assert against the City on account of being unable to perform its contract. The items of claim or damage should be in such detail as will enable the City to check them for accuracy and reasonableness.

"We would like, if possible, to have the claim segregated so as to cover the damages during the period the contractor and the City were prevented from proceeding with the contract under the restraining order of the Law and Equity Court entered on July 6, 1956, and which expired on October 1, 1956." (Emphasis added.)

The contractor furnished the requested information. On February 3, 1958, the city council adopted a resolution stating, "That the site approved by the Board of Zoning Appeals on the Pine Camp property for the erection of the detention home for the Juvenile and Domestic Relations Court be and is hereby abandoned."

On April 18 counsel for the contractor wrote to the City Manager reviewing the entire matter and stating as follows:

"Ewing is still willing to perform the contract as stated in its letter of July 18, 1956, and reiterated in its letter of September 24, 1957. Ewing is entitled to have written instructions to proceed with the work or to have wirtten notification that the City has canceled the contract pursuant to the general conditions thereof. Unless, by May 1, 1958, Ewing is directed to proceed with the work or is given notice of cancellation, it must be assumed that the City has abandoned the contract, in which event Ewing will have no choice other than to treat the contract as having been breached by the City."

No reply having been received from the city as to its intended course of action, the present suit was instituted.

In view of this situation the lower court held that the contract had been breached by the city and awarded damages to the contractor

for the amount stated. On appeal the city seeks to escape liability on several grounds, none of which we find is meritorious.

■ First, the city says, the contract was illegal and unenforceable because it contemplated the construction of the building on a site forbidden by the zoning laws. We need not consider whether the city is estopped to assert this defense in view of the fact that the location was approved by the city council which had the power to change the zoning ordinance to permit the location of the building there.

There is authority for the view that a contract which contemplates a violation of zoning regulations may be illegal and unenforceable. But that is not so where, as here, the zoning law permits a variation in the regulations and the granting of a permit for the proposed use. In that case the performance of the contract is in conformity with and not in violation of the zoning law. 58 Am. Jur., Zoning, § 13, p. 946; 101 C. J. S., Zoning, § 136, p. 895; *Stockburger* v. *Dolan*, 14 Cal. 2d 313, 94 P. 2d 33, 128 A. L. R. 83; Annotation, 126 A. L. R. 87.

In the present case the record discloses that pursuant to Section 17.20 of the city charter (Acts 1948, ch. 116, at page 254), the city appealed to the Board of Zoning Appeals from the decision of the Commissioner of Buildings denying the issuance of the permit. By the authority of that section of the charter the Board granted a permit for the location of the proposed building on the site, and that action was approved by appropriate judicial decree. *Wicker Apartments, Inc.* v. *City of Richmond, supra,* 199 Va. 263, 99 S. E. 2d 656. Thus it was settled in that case that the legality of the site had been determined according to the zoning law.

It is true that the Board of Zoning Appeals granted the permit upon the condition that the proposed building be set back farther from the street than had been originally contemplated. But this was a minor change which was acceptable to both the city and the contractor and in no manner affected the performance of the contract.

There is another compelling reason for disallowing the city's claim that the contract was illegal and unenforceable. It is clear that after the action of the Board granting the permit, both the city and the contractor ratified and confirmed the contract as thus modified. As has been said, the city officials directed the contractor to delay work on the contract pending the outcome of the Wicker Apartment appeal. The contractor replied that it stood ready to proceed with the contract when directed to do so by the city. Even after it had become

doubtful whether the city would proceed with the project, its attorney wrote counsel for the contractor on December 4, 1957, that, "It is recognized that the City has a binding contract with A. H. Ewing's Sons, Incorporated, for this construction." Thus, if it be assumed that the contract was originally unenforceable because of the zoning regulations, after that impediment was removed the parties confirmed and ratified the contract, thus recognizing their mutual obligations under it.

The city next contends that the contract was unenforceable because, at the time it was entered into, both parties were under the mutual mistake that the building could be located on a site which was prohibited by the zoning law. The short answer to this contention is that if there were a mutual mistake at the inception of the agreement, it was removed by the action of the Board of Zoning Appeals and the subsequent ratification of the contract by the parties.

Again, it is said that the contract was unenforceable because of impossibility of performance. Here the contention is that the contract provided for the completion of the project within 325 days from the date of the contract and that this became impossible by reason of the prosecution of the appeal by Wicker Apartments from the order of the Board of Zoning Appeals and the restraining order which was granted on its motion.

There is no substance to this contention. The Board of Zoning Appeals issued the necessary building permit on July 2, 1956. Wicker Apartments appealed from the decision on July 6, and secured a temporary restraining order which expired on October 1. Section 17.23 of the city charter (Acts 1948, ch. 116, at page 257) provides, in substance, that an appeal from an order of the Board of Zoning Apeals "shall not stay proceedings upon the decision appealed from but the court may, on application, notice to the board and due cause shown, issue a restraining order." Thus, when the injunction expired on October 1, the parties were free to proceed with the performance of the contract. The fact that the city chose to delay the commencement of the work pending the outcome of the Wicker Apartments appeal, and so notified the contractor, was wholly of the city's own choosing. But, in any event, since the contractor agreed to the delay, both parties waived the time of performance provision.

The contract provided that, "The Owner shall have the right at any time to cancel this Agreement upon giving seven (7) days notice in writing to the Contractor in which event the Contractor

shall be relieved of further liability to the extent as if such work had been duly completed and shall be entitled to payment for all work executed and any loss sustained upon any plant or materials and reasonable profit and damages."

The lower court held that since no such notice of cancellation was given, the adoption of the resolution by the council on February 3, 1958, directing the abandonment of the project, constituted a breach of the contract by the city.

The city contends that the written notice of cancellation provided for in this clause was not necessary because the contractor had actual knowledge from information published in the newspapers, from time to time, that the project would be abandoned. Hence, it says, the contractor's claim for damages should be determined in the manner provided for in the cancellation clause.

We agree with the ruling of the lower court that if the city intended to cancel the contract it should have done so in the manner therein provided. Indeed, as has been said, as late as April 18, 1958, after the contractor had seen in the press that the city council had decided to abandon the project, counsel for the contractor wrote the City Manager that under the terms of the contract the contractor was entitled either to a direction to proceed with the work or a written notification of cancellation, and that if the latter notification was not received within a short time the contractor would assume that the contract had been abandoned and breached by the city. Despite this letter, the contractor received no cancellation notice. Hence, the lower court correctly determined that the contract was breached by the city.

Complaint is made that the statement in the City Attorney's letter of December 4, 1957, quoted above, that, "It is recognized that the city has a binding contract with A. H. Ewing's Sons, Incorporated, for this construction," should not be considered because, it is said, this was "clearly a part of an offer to compromise" the claim which the contractor had against the city. This contention is without merit.

The letter stated that the city was contemplating the abandonment of the project and before reaching a conclusion thereon desired to know what claims would be asserted against it. In asking for this information it expressly recognized the effect of the "binding contract" between the parties and left open the determination of the correctness of these claims. The recognition of the existence of a binding contract was in the nature of an admission of an independent fact pertinent

to the issue of the correctness of the claims. *Brickell* v. *Shawn*, 175 Va. 373, 381, 9 S. E. 2d 330, 333, and authorities there cited. Upon this principle an express admission of liability made during negotiations for a compromise is admissible. See 20 Am. Jur., Evidence, § 566, p. 479; 31 C. J. S., Evidence, § 287, p. 1048.

The final contention of the city is that the evidence adduced by the contractor fails to show with the required certainty and definiteness the amount of damages awarded to it.

In *Central Lunatic Asylum* v. *Flanagan*, 80 Va. 110, 116, we held that where the completion of performance of a contract for the erection of a building was prevented by the owner and the contractor was without fault and willing to perform, the contractor was entitled to recover for work and labor done, money expended and materials furnished, and in addition "for the profits which he would have realized" had he been permitted to complete the contract. See also, *Berry* v. *Huntington Masonic Temple Assn.*, 80 W. Va. 342, 93 S. E. 355, 365; 25 C. J. S., Damages, § 78, p. 575 *ff*. The contractor's liability to subcontractors is a proper element of his damages. *Berry* v. *Huntington Masonic Temple, Assn., supra,* 93 S. E., at page 365.

While speculative and conjectural profits cannot be recovered in such an action, all damages which are the direct result of the breach and which can be proved with reasonable certainty, though not with exactness, may be recovered. *Manss-Owens Co.* v. *Owens & Son*, 129 Va. 183, 202, 203, 105 S. E. 543; *Agostini* v. *Consolvo*, 154 Va. 203, 215, 153 S. E. 676.

In the present case the contractor's proof of damages measures up to these requirements. It proved its actual expenses under the contract, its liabilities incurred to subcontractors, what the work would have cost if it had been completed, and the profit the contractor would have earned if it had been permitted to carry out the contract. This evidence was presented in detail and documented by exhibits. The city offered no evidence attacking the accuracy of these figures. The lower court, sitting as a jury, found that these items of damages were the direct and proximate result of the city's breach of the contract. We fully agree with that conclusion.

For these reasons the judgment is

*Affirmed,*