# Richmond

PENNSYLVANIA STATE SHOPPING PLAZAS, INCORPORATED, ET AL. v. JAMES F. OLIVE, ET AL.

June 12, 1961.

Record No. 5238.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

The opinion states the case.

*John W. Edmonds, III (David J. Mays; Tucker, Mays, Moore & Reed*, on brief), for the appellants.

*Joseph J. Lawler (Daniel H. Payne; Edwin C. Kellam; Wolcott, Wolcott & Payne; Kellam & Kellam*, on brief), for the appellees.

I'ANSON, J., delivered the opinion of the court.

The appellees, James F. Olive and Eastern Supply Corporation, hereinafter collectively called Olive, filed on September 8, 1958, their joint complaint under the declaratory judgment statute, § 8-578, Code of 1950, against the appellants, Pennsylvania State Shopping Plazas, Inc., Tulip Realty Company of Virginia, Food Fair Stores, Inc., and Virginia Super Food Fair Stores, Inc., hereinafter collectively called Food Fair, seeking specific performance of a contract of lease, and in the event specific performance not be decreed that a jury be impaneled to assess damages for the breach thereof. After an *ore tenus* hearing the Honorable Thomas M. Johnston, acting judge, entered a decree denying specific performance, holding that Food Fair was not excused from performance of the contract, and decreeing that a jury be impaneled to assess the amount of damages for its breach. The appellants excepted to the ruling of the chancellor, except that part of the decree denying specific performance. On a later date a jury was impaneled, and at the hearing presided over by the Honorable Robert S. Wahab, Jr., judge of the court, a verdict was returned in favor of the appellees in the amount of $65,000, on which judgment was entered by the court, and the appellants are here on an appeal from the final decree.

In its assignments of error Food Fair contends that the court erred in (1) not finding that it was excused from performance of the contract of lease because of impossibility of performance; (2) retaining jurisdiction and not transferring the case to the law side of the court, pursuant to § 8-138, Code of 1950, 1957 Replacement Volume; and (3) refusing to set aside the verdict of the jury on the ground that the damages had not been proved as required by law.

The evidence, stated in the light most favorable to the appellees in accordance with well recognized principles, shows that in June, 1956, James F. Olive, principal owner and officer of Eastern Supply

Corporation, a gasoline jobber, entered into a contract to purchase for $105,000 a certain parcel of land in Princess Anne county (annexed on January 1, 1959, by the city of Norfolk) fronting 420 feet on the north side of Little Creek road, with a depth of 500 feet, and bounded on the west by Mona avenue.

Olive obtained a use permit on July 16, 1956, from the proper county authorities to construct and operate a gasoline service station occupying a space of 150 feet by 150 feet, or 22,500 square feet, on the southwest corner of the parcel.

On August 1, 1956, Olive agreed to sell the entire parcel of land to Food Fair for $131,000 (later reduced to $126,000). Under the sale contract Food Fair agreed, as a condition of the sale, that upon its erection of a shopping center on the property it would construct for Olive, on 2,000 square feet of the land, a building containing not more than 1,250 square feet, and on the remaining area to install pumps and tanks to be used in the dispensing of gasoline, pave the area, and lease the "store" to him under the terms of its usual shopping center form lease for a term of twenty years. The building provided for was the standard size for service stations, and the minimum rent agreed upon was based on the cost of constructing the building, installing pumps and tanks, and paving the area attributable to the service station, with the maximum rental based upon 1½ cents per gallon of all gasoline dispensed. Title to the property was conveyed to Food Fair in October, 1956, and construction of the shopping center building, without provision being made in it for the service station, was completed in September, 1959.

When the contract of August 1, 1956, was entered into Olive pointed out on a plat of the land his proposed location of the service station, informed Food Fair that he had obtained a use permit for the construction and operation of the station on the southwest corner and of the requirements of the county zoning ordinance for set-back lines and the regulations of the State Highway Department for entrances and driveways. However, the exact location of the station in the shopping center was left open in the contract in order that the site might be considered by Food Fair's architect in preparing the overall plans. Olive agreed to the erection of the station in any part of the shopping center "as long as they [Food Fair] provided access to it."

Numerous written requests were made of Food Fair by Olive, after the execution of the August 1st agreement, for it to designate

the location of the service station and, after conveyance of the property in October, for it to start construction. It was not until July, 1957, that Food Fair's architect completed the drawings for the shopping center, and the location of the service station building was placed at the southeast corner of the property with the proper set-back lines. Food Fair, however, later abandoned this location and never applied for a use permit.

On July 29, 1957, Olive advised Food Fair that a new regulation in the county required general commercial zoning for service stations, as compared with limited commercial at the time of the contract, but that the use permit heretofore granted him would be honored if the station were located on the southwest corner of the parcel without the necessity of applying for a variance in the zoning of the property. He again reminded Food Fair that the county zoning ordinance required a building set-back of 70 feet from Little Creek road and 25 feet from adjoining residential property.

On December 12, 1957, Food Fair advised Olive by letter that he might choose as the location of the station the "southwest corner, which would be the junction of Little Creek Road and Mona Avenue," and that he must obtain the use permit. In response to this communication Olive again advised Food Fair that such a permit had been in existence since July 16, 1956, attached a copy of same, and requested that construction be commenced. Nothing further was heard from Food Fair until March 4, 1958, when, in response to a letter from Olive threatening to bring suit for breach of contract, he was advised through Food Fair's attorney that it was unable to proceed with construction because it had not been able to get the necessary permits. It then developed that Food Fair's last proposed location of the service station, on the southwest corner of the land, did not take into consideration the set-back lines required under the county zoning ordinance and the requirements for driveways.

The first effort on the part of Food Fair to obtain the necessary permits for the proposed location of the station was during the latter part of May, 1958, when a representative of Food Fair sought a building permit and he was told by a county official that a permit could not be issued to construct a service station on 2,000 square feet of land at the corner of Little Creek road and Mona avenue (which is the southwest corner of the parcel). Later, in October, 1958, an attorney employed by Food Fair discussed with the county planning director and the planning commission the possibility of obtaining a

use permit to erect the service station, and he was advised that no permit could be issued for an area of less than 150 feet by 150 feet.

The county zoning ordinance does not prescribe the area required for the construction of a service station, and the planning commission may exercise its discretion in determining the area. Permits have been granted in the county for service stations having an area of less than 150 feet by 150 feet.

No formal application was ever filed by Food Fair to obtain the necessary building permit or a variance in the zoning regulations. Hence, there was no appeal to the zoning board of appeals from the informal discussion of Food Fair's attorney with the planning commission.

During the time of the negotiations between the parties it was developed by evidence that Food Fair decided to go into the service station business and had purchased a chain of stations.

On the issue of damages testimony was introduced by Olive and his several witnesses to show the estimated number of gallons of gasoline that the proposed station would pump, the gross profit per gallon and the net after the payment of overhead.

The evidence also shows that Olive's net profit from the operation of fourteen service stations was approximately $2,000 per year, and that five of the eight service stations operated by others in the shopping center area had been closed before the hearing of this cause in the court below.

■■ Food Fair argues in support of its first assignment of error that it is excused from performance of the contract of lease because of the impossibility of performance under the county zoning laws. There is no merit in this contention.

There is authority that the obligor in a contract is excused from its performance when to perform would violate zoning regulations, but the rule is not applicable where, as in the present case, the zoning laws permit a variance in the regulations and some discretion may be exercised by the proper authorities in granting a permit for a proposed use. *City of Richmond* v. *Ewing's Sons*, 201 Va. 862, 867, 114 S. E. 2d 608, 611; *Silverman* v. *Isaac Goldmann Realty Corporation*, 232 App. Div. 292, 249 N. Y. S. 505; 58 Am. Jur., Zoning, § 13, p. 946; 101 C. J. S., Zoning, § 136, p. 895; Annotation, 128 A. L. R. 87.

The evidence clearly supports the findings of the chancellor that Food Fair did not make a bona fide effort to obtain the necessary permits to construct the station, either before or after the change in

the county zoning law; that the negotiations between the parties and the drawings of Food Fair's architect of the first proposed location of the station at the southeast corner of the property show that it was the intent of the parties that driveways and parking areas were to be used for the benefit of the service station in addition to the 2,000 square feet to be used for the building and gasoline pumps, and that Olive was to be charged rent for the paved areas attributable to his use.

The chancellor's findings of fact have the same weight as a verdict of the jury and will not be disturbed by this Court unless they are plainly wrong or without evidence to support them. *Packard Norfolk* v. *Miller*, 198 Va. 557, 558, 95 S. E. 2d 207, 208; *Crump* v. *Gilliam*, 190 Va. 935, 940, 941, 59 S. E. 2d 72, 74.

There was no obligation on Olive to seek a use permit for construction of the service station, as contended in one of Food Fair's letters. As a part of the consideration for the sale of the property Food Fair agreed to construct the station and the duty rested on it to carry out its agreement insofar as it was possible by obtaining the necessary permits. It made no effort whatsoever to fulfill its obligation under the contract until May, 1958, and that was limited to an attempt to obtain a building permit to construct the station on 2,000 square feet of land without considering the required set-back lines, or disclosing that the driveways and parking areas around the station were to be used in connection with it, as contemplated by the parties under the contract. It appears from the evidence that Food Fair sought ways to escape performance under its contract by not making a bona fide effort to comply, and it is not excused.

Food Fair next contends that it was error not to transfer the cause to the law side of the court, pursuant to § 8-138[1], Code of 1950, 1957 Replacement Volume, where it could set up the defense of im-

---

[1] "No case shall be dismissed simply because it was brought on the wrong side of the court, but whenever it shall appear that a plaintiff has proceeded at law when he should have proceeded in equity, or in equity when he should have proceeded at law, the court shall direct a transfer to the proper forum, and shall order such change in, or amendment of, the pleadings as may be necessary to conform them to the proper practice; and, without such direction, any party to the suit shall have the right, at any stage of the cause, to amend his pleadings so as to obviate the objection that his suit or action was not brought on the right side of the court.

"After any such amendment has been made, the case shall be placed by the clerk on the proper docket of the court and proceed and be determined upon such amended pleadings.

"The defendant shall be allowed a reasonable time after such transfer in which to prepare the case for trial."

possibility of performance before the jury impaneled to assess damages for the breach of the contract of lease. There is no merit in this contention.

Code § 8-138 is remedial and not technical, and any harmless infringement of its provisions will be disregarded. *Credit Corp.* v. *Kaplan,* 198 Va. 67, 70, 92 S. E. 2d 359, 361; *Sacks* v. *Theodore,* 136 Va. 466, 472, 118 S. E. 105, 106, 107. Its provisions may also be waived by the parties entitled to invoke them, and in such case they will be precluded from reliance upon it on an appeal to this Court. *French* v. *Stange Mining Co.,* 133 Va. 602, 632 114 S. E. 121, 130.

The record shows that no request was made by Food Fair to transfer the cause to the law side of the court after the chancellor's ruling that a jury be impaneled to determine the amount of damages, if any, on account of the breach of the contract. A bill of particulars on the question of damages was requested by Food Fair and furnished by Olive, and a jury was impaneled at a later date to hear the matter. The case proceeded as if it were a law case. The chancellor considered the jury's verdict as if it were rendered in an action at law and not merely advisory, as in the trial of an issue out of chancery. The defense of impossibility of performance was raised in the hearing before Chancellor Johnston on the issue of specific performance and he held that under the evidence Food Fair was not excused from the performance of the contract. This issue, having been once determined, could not have been raised again even if the cause had been transferred to the law side of the court. The defense of impossibility of performance is not limited to an action at law, but may also be asserted in a suit in equity. *Paddock* v. *Mason,* 187 Va. 809, 816, 48 S. E. 2d 199, 202; 12 Am. Jur., § 131, p. 622.

The jurisdiction of the court of equity was properly invoked to decree specific performance of the contract, which was the chief issue set out in the bill of complaint, and the chancellor's failure to transfer the cause to the law side of the court was at most only a harmless infringement of the provisions of Code § 8-138. A jury trial was afforded Food Fair and none of its rights was violated. Moreover, it waived its rights to invoke the statute and is precluded from raising the point here.

Food Fair contends in its third and final assignment of error that the decretal judgment should be set aside because the damages fixed by the jury had not been proved with any reasonable degree of certainty. We think this assignment of error is well taken.

The principle is well settled that the measure of general damages recoverable for a breach by the proposed lessor of a contract to lease real property is the difference between the rent agreed upon and the actual rental value of the premises for the term. *Newbrough* v. *Walker*, 8 Gratt. (49 Va.) 16, 19, 56 Am. Dec. 127; 32 Am. Jur., Landlord and Tenant, § 32, p. 54; Annotation, 104 A.L.R. 132.

In ascertaining the rental value of premises leased for a non-industrial business the courts recognize the distinction which exists between the interruption of an established business and preventing the establishment of a new business. In *duPont Co.* v. *Universal Moulded Prod.*, 191 Va. 525, 62 S. E. 2d 233, Mr. Justice Spratley, speaking for the Court, said:

"The distinction which exists between the interruption of an established business and a new business is recognized. Where the breach of a contract causes an interruption in a business with an established earning capacity, and there is no other practical way to estimate the damages thereby caused, evidence to show the prior and subsequent record of the business has been held admissible to permit an intelligent and probable estimate of the amount of damages thereby sustained; but where a new business or enterprise is involved, the rule is not applicable for the reason that such business is an adventure, the successful operation of which depends upon future bargains, states of the market, and on too many other contingencies to furnish a safeguard in fixing the measure of damages. *Whitehead* v. *Cape Henry Syndicate, supra*, [111 Va. 193, 68 S. E. 263]; *Forbes* v. *Wyatt*, *supra* [143 Va. 802, 129 S. E. 491]; *Sinclair Refining Co.* v. *Hamilton & Dotson, supra* [164 Va. 203, 178 S. E. 777, 99 A. L. R. 929]; 25 C. J. S., Damages, section 42b, page 518; 15 Am. Jur., Damages, section 134, page 542." 191 Va. at p. 573, 62 S. E. 2d at p. 255.

The record shows that, although the service station to be constructed and operated was a new business, testimony was offered by Olive and other witnesses of anticipated profits from its operation. The rental value of the premises was fixed by Olive and his witnesses on their estimates of the number of gallons of gasoline that would be pumped at this new gas station, the gross profit per gallon, and the net profit after payment of operating costs. Such estimates cannot be made with any degree of certainty for a new business, since they are purely speculative and existing only in anticipation. The successful operation of a gasoline filling station business depends upon many factors, such as the personality of the operator and the service ren-

dered by him and his employees, the popularity of the brand of gasoline sold, the condition of the market, and many other contingencies.

The chancellor properly instructed the injury "that the measure of plaintiff's damages, if any, is not the loss of anticipated profits from the business intended by the parties to be conducted on the premises for the reason that such damages are too remote, speculative and uncertain to be awarded," but it is evident that the court's instruction was disregarded by the jury in arriving at their verdict. The court expressed dissatisfaction with the size of the verdict, but concluded that it could not substitute its judgment for that of the jury, and entered decretal judgment on their verdict.

Instruction No. 1, given on behalf of Olive, correctly states the measure of damages, if any, both general and special, recoverable in this cause. It reads as follows:

"The court instructs the jury that the measure of damages to plaintiffs is the value of the lease of the premises in excess, if any, of the following:

(1) The agreed rent called for by the contract between the parties dated August 1st, 1956, and

(2) Any expenses or costs which may have reasonably and necessarily been incurred by plaintiffs under the contract."

The jury having wrongfully considered the loss of profits to Olive in arriving at their verdict, the decretal judgment is set aside and the cause is remanded for a new trial on the question of damages only.

*Affirmed in part; reversed in part; and remanded.*