INTER–CONTINENTAL PROMOTIONS, INC., Appellant,

v.

William B. MacDONALD, Jr., and New Amsterdam Casualty Company, Appellees.

No. 22685.

United States Court of Appeals Fifth Circuit.

Oct. 10, 1966.

Coleman, Circuit Judge, dissented.

Mallory H. Horton, Miami, Fla., for appellant.

Marion E. Sibley, Miami Beach, Fla., for appellees.

Before WISDOM and COLEMAN, Circuit Judges, and HUGHES, District Judge.

WISDOM, Circuit Judge:

Before a small crowd in Miami Beach, Florida, February 25, 1964, Cassius Clay (Muhammad Ali) knocked out "Sonny" Liston in the seventh round of a lackluster prize fight for the heavyweight championship of the world. Inter-Continental Promotions, Inc. owned both fighters. William B. MacDonald, the on-the-scene promoter, had agreed to pay Inter-Continental $625,000 for the live gate rights. Unfortunately for MacDonald, the gate receipts amounted to only $225,000. He turned over this amount to Inter-Continental. Inter-Continental sued for the balance. MacDonald and his surety now say that it was illegal to promote a prize fight in Florida, and that the contract was illegal on its face. The district court, agreeing with the defendants, dismissed the complaint. We disagree.

\* \* \* \* \* \*

The contract between the parties called for MacDonald "to stage and handle the

live aspect of [the] promotion". The two opening paragraphs of the contract provide:

1. Inter-Continental hereby agrees to produce Charles "Sonny" Liston and Cassius M. Clay, Jr., on Tuesday, February 25, 1964, at an hour to be named, at the Miami Beach Convention Hall in Miami Beach, Florida, where they will then and there engage in a boxing contest with each other, for fifteen rounds or less, for the Heavyweight Boxing Championship of the World.

2. MacDonald shall have the right and obligation to promote said boxing contest in the manner he deems fit; to print and sell admission tickets thereto; to collect the proceeds of ticket sales; to arrange all seating; to make whatever arrangements he deems necessary for the press; to pay all local, state, and federal taxes on admissions; to arrange and pay for the undercard preliminary fights; to pay all fees and expenses of the controlling boxing commission; to advertise and promote said live gate; to make press releases; and, to do any and all things of that kind and nature reasonably necessary for the enhancement of said live gate.

MacDonald agreed to post a bond of $300,000 insuring his performance. New Amsterdam Casualty provided this bond.

The contract required MacDonald to pay the sum of $625,000 "upon the completion of the boxing contest". At the time MacDonald made his payment of $225,000, apparently he assumed that the contract was lawful.

Inter-Continental notified New Amsterdam of MacDonald's default. New Amsterdam refused to pay the $300,000 allegedly due under the performance bond. Inter-Continental then brought this diversity action for breach of contract against MacDonald and New Amsterdam.

The defendants moved to dismiss the original complaint on the ground that Florida law makes it a felony "to voluntarily engage in" or "to render aid" in "any pugilistic exhibition, fight or encounter * * * [for] which any admission fee is charged" [1] except " * * * boxing exhibitions held by and under the auspices of the American Legion, disabled American veterans, veterans of foreign wars of the United States, * * * " or one of several other specifically approved organizations.[2]

Inter-Continental moved to amend its complaint. The amendment alleges facts bringing the contract within the exception permitting "boxing exhibitions" to be held under the auspices of certain organizations: [3]

"Said contract concerned the holding and conducting of a pugilistic contest which was to be held on February 25, 1964 between Charles 'Sonny' Liston and Cassius M. Clay, Jr. Said contest was held by and under the auspices of the Veterans of Foreign Wars of the United States and was licensed and/or

1. F.S.A.—§§ 548.01, 548.02.

2. F.S.A.—§ 548.03.

3. 548.03 "Pugilistic exhibition defined * * * [P]rovided, that nothing contained herein or in any law or municipal regulation shall be construed as applying to boxing exhibitions held by and under the auspices of the American legion, disabled American veterans, veterans of foreign wars of the United States, Spanish-American war veterans, or companies or detachments of the Florida national guard, Y.M.C.A., junior chamber of commerce, or any college which is a member of any recognized amateur athletic association and the Circulo Cubana club, a charitable organization now in existence, whether an admission fee is charged or not; provided further, that nothing contained herein shall be construed to prohibit any municipality from exercising its police powers to regulate *boxing* and wrestling exhibitions held under the auspices of the above named organizations." This provision is not found in the original act, Laws of Florida, 1895, Chapter 4402, section 3, nor in Gen.St.1906, section 3255; or Rev. Gen.St.1920, section 5086. It was added in Laws of Florida, 1927, c. 12213, section 1; Comp.Gen.St.1927, section 7188; Laws 1931, c. 14831, section 1, Laws 1935, c. 17179, section 1, and this was the law in this state thereafter until 1951.

permitted by the City of Miami Beach, Florida, as a pugilistic exhibition held under the auspices of the Veterans of Foreign Wars of the United States. In this connection, plaintiff specially pleads Florida Statutes Annotated Section 548.03 as being the statutory basis for (a) the legal holding and conducting of said pugilistic encounter, and (b) the legality of said contract."

The district court did not rule on this motion for leave to amend nor refer to it in the order dismissing the complaint.

The court gave two reasons for its order. First, the "contract between the parties called for the promotion of a prize fight", not a "boxing exhibition" within the meaning of the exception provided in Section 548.03. Second, even if it was a "boxing exhibition, none of the parties to the contract are within the exception provided in Section 548.03" because none is a member of any of the exempted organizations listed in that section of the law. "Nor does the contract provide that the fight shall be held under the auspices of one of the exempted organizations."

## I.

■■ There is no doubt that a contract to perform an illegal act is void and will not be enforced in Florida courts. Local No. 234, etc. v. Henley & Beckwith, Inc., 1953, Fla., 66 So.2d 818; Lassiter & Co. v. Taylor, 1930, 99 Fla. 819, 128 So. 14, 69 A.L.R. 689. But a close look at the statute's language and legislative history compels the conclusion that the Florida legislature regards a prize fight as a "pugilistic exhibition"; a prize fight with gloves as a permissible "boxing exhibition", if it meets certain requirements.

A. Section 548 was enacted in 1895. Section 548.01 is entitled, "Prize fighting, pugilistic exhibition; penalty." It reads:

Any person who shall voluntarily engage in any pugilistic exhibition, fight or encounter, with or without gloves, between man and man, or in an exhibition or fight between man and bull, or between man and any other animal, for money or anything of value, or upon the result of which any money or anything of value is to be collected, acquired, bet or wagered, or to see which any admission fee is charged, directly or indirectly, shall be punished by a fine of not less than two thousand five hundred, nor more than five thousand dollars, or by imprisonment for not more than five years.

The statutory definition, originally enacted without provisos, is contained in Section 548.03:

By the term *"Pugilistic exhibition, encounter or fight,* with or without gloves," as used in this chapter, *is meant any voluntary fight or personal encounter, by blows,* between two or more persons, for money, prize of any character, points, distinction or fame, or other thing of value, or upon the results of which any money or thing of value is bet or wagered, or for which an admission fee is charged, directly or indirectly. (Emphasis added.)

The defendants construe the definition as referring to three different kinds of pugilism: (1) exhibition, (2) encounter, *and* (3) fight. Or at least two: (1) exhibition and (2) encounter or fight. They rely on Webster's New International Dictionary (2d Ed.) to show that "fight" means "a violent physical struggle for victory" and "encounter" means "a meeting with hostile purpose". They make no reference to Webster's definition of "exhibition" as "any public show; a display as of feats of skill". By exclusion, the defendants reach the result that a "pugilistic exhibition" is not a "fight" or an "encounter" and therefore does not apply to prize fights. Since the contract refers to the contestants as "fighters" and to the match as a "fight for the heavyweight championship", the defendants contend the subject of the contract was a "fight or encounter", not an "exhibition". The defendants assert in their brief that "the definition of the conduct condemned by the statute is for the purpose of differentiating between the condemned conduct and certain conduct not condemned, as set forth in the proviso

clause of said section as follows: 'provided that nothing contained herein * * shall be construed as applying to *boxing exhibitions* held by and under the auspices of the American Legion' " and certain other organizations. This is a patent error, for the legislature defined the condemned conduct in 1895, thirty-two years before the proviso was added to the statute. The 1927 amendment does carve out an exception for certain approved boxing exhibitions,[4] but the word "exhibition" as used in this proviso must take the meaning originally given it when Section 548.03 was enacted.

As we read the law, and as the legislature characterized the offense in the title to Section 548.01, the condemned activity is prize fighting or, more accurately, "pugilistic exhibitions". The term "prize fighting" has no technical or common law meaning. Sullivan v. State, 1890, 67 Miss. 346, 7 So. 275. A "prize-fighter", today as in 1756 when Dr. Samuel Johnson defined the words, is "one that fights publicly for a reward". The legislation prohibits one thing—public displays of pugilism for reward; not two things, (1) sparring exhibitions and (2) fights or encounters. The title to Section 548.03, therefore, is "Pugilistic exhibition defined".

A simple test exposes the fallacy in the defendants' theory. If, as they argue, a "pugilistic exhibition" is something different from a "fight" or an "encounter", one should be able to arrive at the definition of pugilistic exhibition by dropping the words "encounter or fight" and that portion of the section relating only to these words. No portion of the section relates exclusively to "encounter or fight". We find, therefore, that

> "By the term pugilistic *exhibition* * * * is meant any voluntary *fight* or personal *encounter* by *blows* * * at which an admission fee is charged." (Emphasis added.)

Pugilistic exhibitions are therefore public fights for money—in short, prize fights. The laws of some states use the term "prize fighting" or its equivalent without qualifying it. In such cases it "includes all fights of that character, * * * whether witnessed by many or by few people". Seville v. State, 1892, 49 Ohio St. 117, 30 N.E. 621, 622, 15 L.R.A. 516. Florida restricts application of the law to pugilistic *exhibitions,* that is, a "public show" or "display" of pugilism, as against private fights.

The syntax and punctuation of Section 548.03 support this construction. The statute uses the singular: one term, "pugilistic exhibition" is defined, not three terms. The phrase *"encounter or fight"* modifies and describes "pugilistic exhibition". It is set off by commas and in the disjunctive sense *"or"* is used to show that pugilistically "fight" and "encounter" are equivalents, and both are other names for "pugilistic exhibition". Of course, sports writers have always used these terms as equivalents and use them now in faultless sportese to describe "pugilistic exhibitions" or prize fights. For the defendants' construction to be correct, the legislature should have used *"terms"* not "term"; preferred *"and"* to *"or"*, preceded by a comma, if encounter and fight are different; and separated the definitions. If the defendants were right, Section 548.03 should start:

> The term*s* "pugilistic exhibition, encounter, *and* fight" mean, respectively * * *

In paragraph one of Section 548.02 the legislature does use a comma before "fight", so that all three, "exhibition, encounter, or fight" refer to one thing. In paragraph two of that section these terms are telescoped to "encounter or contest" and, finally, reduced to one word, "contest".[5]

---

4. See footnote 3.

5. 548.02 *Second, Stakeholder, etc.;* penalty Any person who shall act as second, stakeholder, counselor or advisor, or who shall render aid of any such character, for or to the principal or either of them in such exhibition, encounter, or fight shall be deemed a principal in the offense,

If the defendants' construction were accepted, Section 548.03 would be meaningless. The statute would have no definitions, for "encounter" and "fight" would then be described in their own terms as a "fight or personal encounter by blows". And "pugilistic exhibition" would not be defined at all. On the other hand, the statute does make sense if it is read as stating that a "pugilistic exhibition" means "a voluntary fight or personal encounter by blows * * * for which an admission fee is charged".

To accept the notion that a pugilistic exhibition is a mere demonstration of shadow boxing or sparring, one would have to assume that the Florida legislature put such an offense on the same level as bare knuckle fighting. Both offenses would be subject to a fine of not less than $2500 or more than $5000 or imprisonment for not more than five years.

B. The language of this 1895 law must be considered within the context of the times. In 1895 bare knuckle fighting was illegal in almost every state of the union. The Florida statute prohibits prize fighting with or without gloves, but the vice at which the legislation primarily was aimed was public pugilism as then distinguished from boxing.[6] From the time of the 23d Olympiad (688 B.C.) until relatively recently, pugilists fought with their bare hands, or with the caestus (a studded metal glove or wooden hand-shield with slots for the fingers), or wrapped leather thongs around their fists, or used unpadded gloves (a weapon).[7] "Pugilism (from Lat. *Pugil*, boxer) * * (i. e. fighting with the bare fists) was driven out in favor of boxing (i.e. fighting with the glove) by public opinion and by the general adoption in 1866 of the Marquis of Queensberry rules." Encyclopedia Brittanica (1959) Verbo, "pugilism".

Until the final decade of the nineteenth century, a pugilistic "fight or encounter" meant a bare knuckle fight to the finish under London Prize Ring Rules.[8] These rules permitted the fighters to wrestle, throw each other down, jump on one another, and wear three long spikes in each shoe or boot. A round lasted until one fighter fell or was knocked down or thrown to the ground. The contestants fought until one or the other was forced to stop because of exhaustion or bodily injuries. In 1889, only six years before Florida enacted Section 548, John L. Sullivan, the Boston Strong Boy, won the heavyweight championship by knocking out Jake Kilrain in a clandestine match in Richburg, Mississippi, after 75 rounds and two hours and sixteen minutes of bare knuckle fighting under the London

and shall be punished as prescribed in § 548.01.

The sheriff or his deputies, in any county where there is cause to believe that such an encounter or contest is about to occur, shall enter any house or enclosure, or any other place, and arrest, without warrant, any party engaged or about to engage in such contest.

6. Before padded gloves were used in prize fights, however, "boxing" and "pugilism" were synonymous. See Egan, Boxiana: Sketches of Ancient and Modern Pugilism from the days of the renowned Broughton and Slack to the Championship of Crib (London 1818) and Miles, Pugilistica, The History of British Boxing * * * from Fig and Broughton, 1719-1740, to the last championship battle between Ring and Heenan in December 1863 (Edinburgh 1906). See also the Gentlemen's Magazine (1731–1832).

7. I Miles, Pugilistica (Edinburgh 1906); Egan, Boxiana (1818); Menke, Encyclopedia of Sports (1944).

8. The London rules, as drawn by Jack Broughton, and the Queensberry Rules, drawn by John Graham Chambers, are quoted in Heinz, Fireside Book of Boxing (1961) 51, 75; Menke, Encyclopedia of Sports (1944) 171, 172; Fleischer and Andre, A Pictorial History of Boxing (1959) 12. There is an excellent description of bare knuckle fighting in State v. Olympic Club, 1894, 46 La.Ann. 935, 15 So. 190, 24 L.R.A. 452. See also Egan, supra, Miles, supra, Fleischer, Heavyweight Championship (1949).

rules.[9] That was the last *pugilistic* fight or encounter for the heavyweight title in the United States. As late as in 1929, the Encyclopedia Brittanica stated, "Boxing [is] the art of attack and defense with the fists protected by padded gloves, as distinguished from pugilism, in which the bare fists or some kind of light gloves affording little moderation of the blow are employed".[10] The first heavyweight title fight with gloves (5-ounce) and under the Marquis of Queensberry rules was not fought until 1892. In that year, in a bout held at the Olympic Club in New Orleans, Gentleman Jim Corbett knocked out John L. Sullivan in the 21st round.[11] At the time, Louisiana law (Act 25 of 1890) made prize fighting a crime, but excepted "exhibitions and glove-contests * * * within the rooms of regularly chartered athletic clubs".[12] A "pugilistic [*boxing*] exhibition" or "glove contest" under Marquis of Queensberry rules was what today is known as a prize fight. "Exhibition" was not used euphemistically. Corbett was one of the most skillful boxers in all prize fight history. The Sullivan-Corbett boxing contest, compared with the Sullivan-Kilrain bare knuckle fight, was an "exhibition" of the manly art of self defense. And in that sense, the Clay-Liston *entente cordiale* was also a boxing exhibition.

In 1894, the State of Louisiana sued to revoke the New Orleans Olympic Club's license on the ground that the Club held, ultra vires, "exhibitions of what is commonly called prize fighting". State v. Olympic Club, 1894, 46 La.Ann. 935, 15 So. 190. Reporters, lawyers, doctors, and others testified at the trial that the Sullivan-Corbett fight and similar fights were "mere exhibitions of skill in sparring with gloves, not calculated to do *great bodily* injury"; on the other hand, the Sullivan-Kilrain bare knuckle fight to the finish was a prize fight. The Louisiana Supreme Court upheld the jury's verdict that the Club's boxing matches were "exhibitions or gloved contests". "That a nose was occasionally made to bleed * * * or the face somewhat bruised and disfigured, does not alter the case". 15 So. at 198. The case was remanded on rehearing on the ground that the expert testimony was inadmissible. On the second appeal, the Court held: "Fighting in the arena of the club, as described in the record, is prize fighting * * *. It is preceded by the training, the challenge, the attendance of seconds, or umpires, *and of surgeons* * * * all the attendant circumstances of a contest with naked hands." 47 La.Ann. 1095, 17 So. 599, 600.

In Seville v. State, 1892, 49 Ohio St. 117, 30 N.E. 621, 15 L.R.A. 516, the defendant was indicted under a law making prize fighting a crime. He had engaged in a bout licensed by the local mayor as a "glove contest". The contest was al-

9. See Sullivan, The Life and Reminiscens of a 19th Century Gladiator; Fleischer and Andre, supra; Fleischer, supra.

10. Encyclopedia Brittanica, Verbo "Boxing".

11. Corbett has vividly described his fight with Sullivan. Heinz, Fireside Book of Boxing (1961) 85.

12. "Act No. 25, 1890. Defining the crime of prize fighting, and to provide for the punishment thereof in and out of the state of Louisiana. Section 1. Be it enacted by the general assembly of the state of Louisiana, that any person who shall send, or cause to be sent, publish or otherwise make known, a challenge to fight, what is commonly called a prize fight, or who shall accept any such challenge, or who shall engage in such fight, or act as trainer for any such, contemplating a participation in such fight, and any such person who shall act as aider or abettor, backer, umpire, second, surgeon or assistant at such fight, or in preparation for such fight, shall upon conviction thereof, be deemed guilty of a misdemeanor and be punished by imprisonment in the parish jail for not more than six months and be fined not more than five hundred ($500) dollars." (Section two is omitted, as unimportant.) But to this section is appended the following proviso, to wit: "Provided this act shall not apply to exhibitions and glove contests between human beings, which may take place within the rooms of regularly chartered athletic clubs." 15 So. 190, at 192.

legedly held under Marquis of Queensberry rules, but two-ounce gloves were used and the fight was to the finish. The finish came in the 17th round when one of the contestants was battered until he was unconscious. He never recovered consciousness. The Court held that the "question for the jury to decide, was whether this combat was a prize fight, not what the Queensberry rules or any other rules called it, nor what name those accustomed to such combats have given it."

In the second *Olympic Club* decision and the *Seville* decision the Courts did not decide that the fights in question were outside the scope of "boxing exhibitions" or "glove contests"; they held that such contests were prize fights. Some courts, however, have held that the "word 'fight' implies a purpose to use violence for the purpose of inflicting injury", and it is for the jury "to determine whether the defendants in fact engaged in a fight, or merely in an innocent contest". State v. Purtell, 1896, 56 Kan. 479, 43 P. 782. The "innocent contest" in that case was described as a "lawful exhibition" and a "sparring contest", but it was fought under Queensberry rules, was scheduled for 25 rounds with the referee free to continue the fight for additional rounds, and it ended with a knock-out in the 22nd round. In *Purtell* as in the first *Olympic Club* case the Court was willing to describe the contests as "exhibitions". But there is no doubt that all of these so-called exhibitions were prize fights. In the trade and in the common parlance of 1895 a pugilistic exhibition or boxing exhibition included a personal encounter by blows under rules substantially similar to those that governed the Clay-Liston boxing contest.

■ By 1927 the only pugilistic exhibitions that existed were boxing matches, that is, fights or encounters between contestants wearing boxing gloves and fighting under Marquis of Queensberry rules. When the match was for money or when admission was charged, the exhibition was a prize fight. The 1927 amendment legalizes these boxing exhibitions, including prize fights, when they are held by and under the auspices of certain organizations.[13]

C. Related provisions of the Florida statute clearly show that prize fights are within the 1927 exception.

At the same time the exception was enacted the legislature adopted another proviso to Section 548.03. The proviso prohibited

"prize fights * * * for a national or international title".

In other words, prize fights for a state or local title and, indeed, all prize fights except those for a national or international title were legalized when held by the exempted organizations.

In 1951 the Florida legislature repealed the proviso relating to title bouts. In its place, the legislature substituted the following language:

"PROVIDED FURTHER, that nothing contained herein shall be construed to prohibit any municipality from exercising its police powers to regulate *boxing* and wrestling *exhibitions* held under the auspices of the above named organizations." (Emphasis added.)

The undeniable effect of the repeal of the 1927 proviso was to legalize all prize fights, even title bouts—provided, of course, that the fight was held under proper auspices. This broad scale legitimation of prize fighting created the problem whether municipalities might continue to regulate, that is, prohibit or license fights. The object of the 1951 substitute was to reassure the municipalities that the state's legalizing prize fights was not intended to curtail the police power of local authorities. Thus, both the repeal of the 1927 proviso and the enactment of the 1951 proviso show legislative recognition of the legality of prize fighting sponsored by certain organizations.

13. See footnote 3.

Consistent with this view, the Florida legislature in 1957 enacted Section 548.04 requiring that a physician examine a "boxer's" physical condition before the boxer enters the ring. The section reads:

"At any *boxing, sparring or wrestling match or exhibition permitted under § 548.03* there shall be in attendance a duly licensed physician, whose duty it 'shall be to observe the physical condition of the boxers or wrestlers and advise the referee or judges with regard thereto; any competent physician who has not had less than three years experience as a practitioner may be licensed. No *boxer or wrestler shall be permitted to enter the ring unless, not more than three hours before, a physician shall certify in writing that the boxer or wrestler is physically fit to engage in the proposed contest.* The physician's fee shall be paid by the licensee conducting the *match or exhibition.*" (Emphasis added.)

Section 548.04 does not limit itself to "exhibitions", but mentions *"match or exhibition"* in two places, refers to a *"contest"* in a third, and unquestionably applies to "a pugilistic exhibition, encounter, or fight." The substance and tone of the section belie the defendants' argument that the statute outlaws a "fight or encounter". Why a physician unless the "boxing * * * match or exhibition" exposes a boxer to the chance of receiving bodily injuries from blows exchanged in what may be an exhibition but is also a [prize] fight or encounter. As the Louisiana Supremè Court said in the second *Olympic Club* opinion, the presence of a physician (surgeon) is one of the indicia of a prize fight.[14]

■ The wording of Section 548.04 assumes that matches such as the Clay-Liston fight come within the "boxing exhibition" exception. Even if the exception were not originally intended to be that broad, it must be so read now; otherwise the two provisions of the statute would be in conflict. Of course, the con-

flicting provision which is last in time or last in order of arrangement prevails. State v. City of Boca Raton, Fla.1965, 172 So.2d 230, 233. The requirement of a physician at boxing matches is both of these and its statutory purpose, if indeed a conflict exists, must control.

D. In the sports world, as everyone who reads the sports page knows, the inelegant fault of elegant variation is the rule. This rule carries over into legislation relating to sports. In Sections 548.-01 and 548.03 the Florida legislature used "pugilistic exhibition, fight or encounter" to describe a prize fight. In Section 548.02, aided by a comma, "exhibition, fight, or encounter" become an "encounter or contest" and simply a "contest". In Section 548.04 the legislature uses interchangeably the words "exhibition", "contest", and "match". In spite of the variety of expression, the statute is clear.

The contract here refers to the boxers as "fighters" five times and refers twice to the Clay-Liston contest as a "fight". But nine times the contract calls the encounter a "boxing contest", three times a "contest", two or three times a "match" or "bout". On its face, therefore, the contract itself demonstrates that it is in harmony with the Florida legislature's use of the terms "pugilistic exhibition" and "boxing exhibition" to include "boxing contest."

\* \* \* \* \* \*

■ Considering the wording of the Florida statute and its legislative history, we hold that a "prize fight" comes within the scope of the generic terms "pugilistic exhibition" and "boxing exhibition".

### III.

■ The district court held that the contract was void because neither of the parties was or belonged to an approved sponsor listed in the statute, nor did the contract provide that the fight shall be held under the auspices of one of the exempted organizations. The district

14. 17 So. at 600.

court apparently gave no effect to the amended complaint. The defendants argue that the amended complaint was properly dismissed, citing several circuit court cases in which complaints were dismissed because the allegations were in direct conflict with the contracts sought to be enforced. Simmons v. Peavy-Welsh Lumber Co., 5 Cir. 1940, 113 F.2d 812; Foshee v. Daoust Construction Co., 7 Cir. 1950, 185 F.2d 23; and Consolidated Jewelers, Inc. v. Standard Financial Corp., 6 Cir. 1963, 325 F.2d 31. The principle of these cases does not apply to Inter-Continental's amended complaint, because that complaint in no way conflicts with the contract Inter-Continental seeks to enforce. Sponsorship of the fight by the Veterans of Foreign Wars is reconcilable with the contract even though the contract makes no mention of such sponsorship.

Schaal v. Race, Fla.App., 1961, 135 So. 2d 252, urged by the defendants and cited by the district court, is not applicable. In that case, the plaintiff's original complaint alleged that the plaintiff had rendered advertising services for the defendant's political campaign under an oral contract with the defendant. Florida law required that all remuneration for services rendered to a political campaign be authorized in writing by the campaign treasurer, and that a knowing violation of this provision was a misdemeanor. The plaintiff subsequently sought to amend his complaint by deleting the part referring to the political campaign. The court dismissed the amended complaint with prejudice, terming it a sham. The amended complaint, in effect, was a direct contradiction of the very facts alleged in the original complaint that had made the contract unenforceable. No such contradiction appears in Inter-Continental's amended complaint. The amendment is completely consistent with the facts alleged in the original complaint, and could as easily be an attempt to correct a legal oversight as a disingenuous effort to make the agreement conform to the law.

The statute requires only that the fight "be held by and under the auspices" of one of the approved groups. It does not require that the approved group be a signatory to every contract that relates to the fight. The absence of any mention of the Veterans of Foreign Wars in the contract between Inter-Continental and MacDonald is not inconsistent with the allegation that the Veterans of Foreign Wars ultimately sponsored the match. In a set of analogous cases, the courts have consistently held that if an act were illegal unless specifically approved by some governmental administrative authority, a contract to do that act would still be upheld even though the contract itself made no mention of the governmental approval. See Lewis v. Davis, 1947, 145 Tex. 468, 199 S.W.2d 146 (registration under the Texas Securities Act);[15] Nussenbaum v. Chambers & Chambers, 1948, 322 Mass. 419, 77 N.E. 2d 780 (approval under the Federal Wage Stabilization Act);[16] Pennsylvania State Shopping Plazas, Inc. v. Olive, 1961, 202 Va. 862, 120 S.E.2d 372, 88 A.L.R.2d 1016 (performance of construction contract would violate zoning regulations but zoning variance possible to obtain);[17]

---

15. The parties entered a contract to form a partnership for engaging in the oil and gas business. Their projected business activities were illegal unless registered under the Texas Securities Act, and no such registration was mentioned in the contract.

16. The plaintiff sought to enforce an employment contract which had not been approved by the competent federal authority under the Wage Stabilization Act of 1942,

and no mention of obtaining such approval had been made in the contract.

17. "There is authority that the obligor in a contract is excused from its performance when to perform would violate zoning regulations, but the rule is not applicable where, as in the present case, the zoning laws permit a variance in the regulations and some discretion may be exercised by the proper authorities in granting a permit for a proposed use". 120 S.E.2d 372, at 375.

City of Richmond v. A. H. Ewing's Sons, Inc., 1960, 201 Va. 862, 114 S.E.2d 608 (zoning variance); McNally v. Moser, 1956, 210 Md. 127, 122 A.2d 555, 60 A.L.R.2d 388 (zoning variance); and Adamsky v. Mendes, 1950, 326 Mass. 603, 96 N.E.2d 236 (zoning variance). Several of these cases involved situations where the requisite administrative approval had not yet been received, much less mentioned in the contract. The policy even in those cases has been to hold the contract valid unless clearly invalid on its face.

"Courts do not go out of their way to discover some illegal element in a contract or to impose hardship upon the parties beyond that which is necessary to uphold the policy of the law." Nussenbaum v. Chambers & Chambers, supra, 77 N.E.2d at 782.

This is not an executory contract. Inter-Continental has completely performed its part of the bargain. The potential injustice here is far greater than if neither side had performed and one of the parties were seeking to compel the other to do so. Also, the problems of proof here are far less difficult. If the contract were completely executory the question of fact would be one of intention—whether or not the parties at the time of the contract intended to hold the prize fight without the proper sponsorship in violation of the laws of Florida. In the present case the difficult question of intention is not present because the fight has already been held. The only question of fact is the far simpler one of whether the fight actually was held by and under the auspices of one of the approved groups.

Even without benefit of the amended complaint, the contract is not on its face unlawful. MacDonald's obligation under the contract "to stage and handle the live aspect of the promotion" should be construed to include the burden of making arrangements for a *lawful*

fight. If there is any doubt as to what the parties meant, a trial should be had, not to contradict the contract but to show what the parties meant by their contract. The defendants should not be allowed to escape from a bad bargain simply because the contract at the time it was entered into was capable of both lawful and unlawful performance. In the circumstances of this case, illegality is an affirmative defense to be raised in the answer and proved by the defendants who bear the burden of proof on this issue. The defendants raised the issue prematurely in their motion to dismiss. The plaintiffs are entitled to their day in court. (We do not reach the question whether MacDonald *could* assert invalidity as a defense where he was the party responsible for failing to bring the contest within the statutory exemption.)

As for the motion to dismiss for failure to state a claim, this Court has said many times that such a motion "should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim". Arthur H. Richland Co. v. Harper, 5 Cir. 1962, 302 F.2d 324, 325.

We hold that the district court erred in dismissing the complaint. We direct the court to grant the plaintiff's motion to amend its complaint. We remand the case for a trial on the merits consistent with this opinion.

Reversed.

COLEMAN, Circuit Judge (dissenting).

I must respectfully dissent. I am of the opinion, as the District Judge held, that the contract for the prize fight was illegal on its face. This being a question of Florida law, which more appropriately could have been settled by the courts of that State, I shall refrain from further discussion.